```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA


ENERGY POLICY ADVOCATES       :
                              :         Docket No. CV 19-3307
               Plaintiff,     :
                              :             Washington, D.C.
          vs.                 :      Wednesday, September 9, 2020
                              :                2:00 p.m.
UNITED STATES                 :
DEPARTMENT OF STATE           :
                              :
               Defendant.     :
------------------------------x




           TRANSCRIPT OF TELECONFERENCE MOTION HEARING
                    PRELIMINARY INJUNCTION
           BEFORE THE HONORABLE TREVOR N. MCFADDEN
                  UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:    MATTHEW D. HARDIN, Esquire
                      Law Office of Matthew D. Hardin
                      1725 I Street NW
                      Suite 300
                      Washington, DC  20006


For the Defendant:    ALAN BURCH, Esquire
                      U.S. Attorneys Office for the
                      District of Columbia
                      555 Fourth Street, NW
                      Washington, DC  20530


Court Reporter:       CRYSTAL M. PILGRIM, RPR, FCRR
                      United States District Court
                      District of Columbia
                      333 Constitution Avenue, NW
                      Washington, DC  20001
```

<pre>
  1                         P-R-O-C-E-E-D-I-N-G-S

  2          THE DEPUTY CLERK:  We have civil matter 19-3307,

  3  Energy Policy Advocates versus United States Department of

  4  State.

  5      Counsel please introduce yourself for the record, starting

  6  with the Plaintiff.

  7          MR. HARDIN:  Good afternoon this is Matthew Hardin.

  8  I represent Energy Policy Advocates.

  9          THE COURT:  Good morning Mr. Hardin or good

 10  afternoon.

 11          MR. BURCH:  Good afternoon, Your Honor, this is Alan

 12  Burch for the United States.

 13          THE COURT:  Good afternoon Mr. Burch.

 14      All right, I've reviewed the parties filings on the motion

 15  for preliminary injunction.  I'll hear from you Mr. Hardin.

 16          MR. HARDIN:  Thank you, Your Honor.

 17      I think I'll start off by saying that I think the reason

 18  that we're here is essentially because this request has stalled

 19  out.  Originally, I think that some of that might have been

 20  understandable because of the coronavirus issues with

 21  processing requests.

 22      But we do know from status reports that now the State

 23  Department is back processing requests.  They're just not

 24  processing this particular request.  I think that's especially

 25  troubling because this particular request we're up against a
</pre>

1   deadline to use to inform the public.  It's an important issue

2   that both parties have raised in the presidential election.  So

3   continuing to delay this matter while processing other matters

4   is really not the appropriate way to handle this.

5       I think that the State Department has submitted an

6   affidavit that indicates that they're processing other requests

7   and even that other courts have ordered them to process other

8   requests, and that's what we're asking.

9           THE COURT:  Mr. Hardin, why shouldn't we handle this

10  just through a scheduling order rather than through a

11  preliminary injunction?

12          MR. HARDIN:  I think that essentially where we would

13  end up is in a very similar place if the Court were to issue a

14  scheduling order with the appropriate speed that we would ask

15  for.  The reason that I handled it as a preliminary injunction

16  in the filing is just because the presence that we saw from

17  other cases that tended to be how these scheduling issues were

18  handled in the context of information that's very important

19  going up towards an election.  But as far as what the Court

20  decides to call its order, I think it could be preliminary

21  relief or I think it could be a scheduling order with some

22  appropriate speed.  I'm not insistent on any one avenue to get

23  to a resolution.

24          THE COURT:  All right.  So one of the things I guess

25  I'm wrestling with here you point out that there is some

1    dispute between the presidential candidates about the Paris

2    accord.

3         What is less clear to me is that they're actually, there's

4    much disagreement or discussion about this procedural mechanism

5    that you're focused on.  Obviously that's an issue of interest

6    to lawyers and legal significance, but I'm not aware any way of

7    much public debate about whether this agreement or frankly just

8    about any treaty should be going to the Senate versus an

9    executive agreement or even I think they can do both houses of

10   Congress have been known to approve something like this.

11        So I guess I'm not, it's not clear to me that this

12   specific issue is a matter of pressing public concern.

13            MR. HARDIN:  I think that Your Honor is correct when

14   you say that the public isn't debating so much whether the

15   treaty should be ratified in the Senate; if they're saying

16   whether they treaty is good or bad, whether we should enter or

17   should withdraw or should remain in I suppose is the issue

18   that's being debated.

19        I think that a natural consequence of remaining in or

20   withdrawing or rejoining is does the President have the power

21   to do that.  So that's sort of the next step of the debate.  I

22   think that some of what we're up against is we haven't seen;

23   for example, presidential debates this year.

24        The issue hasn't been fully explored, but if the Plaintiff

25   didn't seek relief at this stage of the lawsuit and waited for

1   the public debate to be more exactly on point, it would be too

2   late.  So we're sort of trying to raise this as an issue that

3   both candidates are discussing.  And although they aren't

4   discussing it in the exact context of whether they need the

5   Senate's approval, they're discussing the broader issue and by

6   the time we get down to brass tacks in a presidential debate;

7   for example, it will likely be too late for this Court to rule

8   on the underlying issue.

9          THE COURT:  I see that point, but I worry that that

10  justification could then be used for just about any FOIA issue.

11  A plaintiff telling the Court this is, this specific issue

12  isn't a matter of grave public concern right now, but we need

13  the documents out so that there can be a discussion about it.

14  I don't think that's normally how my colleagues have looked at

15  this type of thing.

16      In the rare case where they've granted a PI, it's been

17  because this very topic is indeed a matter of live, ongoing

18  public debate.  It doesn't feel like you're there yet.  And

19  while I understand your point against, my point is that taking

20  your analysis would really sweep much more broadly than prior

21  PIs have in this area.

22          MR. HARDIN:  I think Your Honor that the Court can

23  certainly craft its opinion rolled into the facts of this case.

24  In this case we have a request that's over a year old.  I think

25  that that shows that in an ordinary circumstance if the

1  government were dealing in processing, I think that this sort

2  of extreme relief would not be necessary.  We wouldn't have

3  come in at the last minute right before an election and said we

4  want the government to change its operations and we want the

5  Court to order relief in two weeks time.

6       I think this is a case where the Plaintiffs have done

7  everything that it can do to raise this issue even before we

8  knew who the two candidates were in the original request.  It

9  brings up the discussion about whether the President has the

10 power in President Trump's announcement.  So they were very

11 diligent about bringing this to everybody's attention in what

12 should have been plenty of time over a year or so.  I think 15

13 months is the exact time.

14      Since that time the government has failed to process the

15 request for one reason or another.  I think some of that

16 failure to process is legitimate.  But the Plaintiff is

17 certainly not responsible for its failure to advance the public

18 debate when the Plaintiff has done everything that it can be in

19 its own diligence.

20           THE COURT:  I understand that.

21      Let me just clarify something. I think you probably

22 misspoke a few minutes ago when you said the debate is about

23 whether we should stay in the Agreement.  You agree that

24 President Trump withdrew the United States from the Paris

25 Agreement.  So the question is now whether we should rejoin it;

1    am I correct on that?

2            MR. HARDIN:  That is correct, Your Honor.  I did

3    misspeak.

4            THE COURT:  And regardless of whether the next

5    President enters us via an executive agreement or a treaty,

6    wouldn't a following President be able to withdraw us all over

7    again?

8            MR. HARDIN:  It's a very interesting question and I

9    think that the problem is who has standing litigated.

10   Presidents have claims to withdraw from treaties, I believe

11   there's a case involving President Nixon and essentially nobody

12   has standing to challenge that asserting the President can

13   unilaterally get us in or out.

14       I think that's why it's important to inform the public now

15   so that they can sort of take the only action that they're

16   going to be able to whether the President can withdraw us or

17   not.

18       I mean on a practical level, it seems that no one would

19   have standing to challenge this withdrawal or rejoining.  But

20   we'd like to give the public an opportunity to make an informed

21   decision now.

22           THE COURT:  Yes, I guess I'm having a hard time

23   seeing how it's a now or never though if we agree we're not in

24   the agreement now and that's because President Trump

25   unilaterally withdrew from the agreement.  Why is whatever the

1  next President does the last word on the subject?  Wouldn't

2  there still be room for debate down the road, that or a

3  subsequent President unilaterally withdraw it again?

4        MR. HARDIN:  Well, I think that in the history of

5  this country, of course we have entered and withdrawn from

6  treaties and future Presidents will enter and withdraw from

7  treaties in the future.  But the question is is the public

8  going to have the opportunity to analyze this treaty and to

9  make its voice heard for the next four years.

10    So at some level if the President chooses to rejoin in

11  2021 versus in 2035, this is the now or never moment because

12  this is the chance the American people have to make their

13  decision at least for the next four years.

14        THE COURT:  Mr. Hardin, is it your position that the

15  abridgment of a right under FOIA constitutes irreparable harm?

16        MR. HARDIN:  I don't necessarily think that it

17  constitutes irreparable harm per se.  I think that certainly

18  there are extenuating circumstance that could make it not an

19  irreparable harm in other cases.

20    I think in this case it constitutes an irreparable harm

21  and I think that's again due to the unique facts of this case

22  and how long this case has been kicking around, that the

23  Plaintiffs have been diligent and the government has not quite

24  frankly.  I think that that's the harm here.  It's not a per se

25  harm.

1        I've never argued for preliminary injunction in a FOIA

2   case until today.  The reason is because I think in most cases

3   it would be inappropriate and the government points it out in

4   its briefing.  I don't think it's inappropriate in this case

5   because of the unique facts of the requested issue and the

6   time.

7        THE COURT:  Okay, I understand your point about the

8   government not processing anything right now.  It doesn't

9   strike me that this is a particularly old case at least as far

10  as FOIA cases go.  You're probably aware that these can hang

11  around for years, depending on the size of the request and the

12  ability of the agency involved to legally process them.  So I

13  think it's a real unusual case.

14       MR. HARDIN:  To flag another issue for the Court.  I

15  think if you look at our motion, we said that the government

16  had not even granted or denied or responded to the request for

17  expedited processing.  And the government said, well of course

18  we responded to that request. I couldn't figure out what was

19  going on with the opinion there especially in light of the

20  government's answer.

21       What we have figured out this morning is that that reply

22  seems to have been sent to the wrong address.  For example, we

23  didn't understand that the government had replied to a request

24  for expedited processing until they filed their opposition.  I

25  think that that shows a broader situation of why we are seeking

1  preliminary relief this close to an election.  It's because the

2  government, although it apparently made a decision on expedited

3  processing and whether this case could be sped along didn't

4  convey that to the Plaintiff so that that could be taken up

5  through the appropriate channels in a scheduling order or with

6  an agency itself prior to this date.

7       So I think that that's why, that's why we're at this late

8  stage of the game seeking preliminary relief.  I would have

9  much rather hardened the issue of whether we were entitled to

10 expedited processing before today.  I would much rather before

11 today likened to have it before today.

12      I think what you see is a situation where the government

13 has been less than diligent.  And I think that the Plaintiffs

14 have been sympathetic in recent months at least because of the

15 coronavirus shut down.  But sympathy at some point can't

16 override the law.  I think that by law we're entitled to

17 expedited processing.  And I think that the State Department

18 must at least process something right now.

19      There seems to be an entire lack of processing.  At some

20 level, whether the Court orders preliminary relief exactly as

21 we've sought or some lesser form of relief that's still

22 appropriate.  I think it's at least appropriate to order that

23 some processing take place under FOIA.  Fifteen months into a

24 case being active, I think that some processing must take six

25 weeks.

1     We suggested what documents would take sort of the first

2  priority, but I think it's definitely a case where a complete

3  lack of processing 15 months in is unusual in FOIA even if it's

4  not unusual for processing not to be concluded.

5          THE COURT:  Mr. Hardin, can you just summarize for me

6  what you would say the irreparable harm is in this case?

7          MR. HARDIN:  The irreparable harm is that the

8  Plaintiff doesn't receive the information certainly within the

9  usual timeline or even expedited time lines.  But that when

10  they receive that information it is stale.  Such that the

11  Plaintiff is a nonprofit organization that sort of engages in

12  the public debate information, educational services on energy

13  issues.

14     And although they will certainly try to distribute any

15  historical origous that is written years down the road about

16  the Paris Agreement.  Their mission is -- they're not a history

17  organization.  They are an educational organization and they

18  want to take this information and educate the public with it

19  while the public has an opportunity to do something with it.

20  And they're not going to be able to do that if they receive it

21  in 2021 or 2023.

22          THE COURT:  So a fair amount of that I mean strikes

23  me as really an irreparable harm, if any, to the public; that

24  if there's this public discourse going on that you're saying

25  that the public is going to be harmed by not having these

1  documents.

2      I wouldn't think you'd have standing though to raise the

3  public's harm; am I right?

4          MR. HARDIN:  I agree, Your Honor.  I agree that we

5  can't raise public harm.  I think there is certainly a harm to

6  the public.  What I was trying to convey and maybe I did it in

7  artfully is that Energy Policy Advocates is an educational

8  organization.  They're not a history organization.  They're not

9  the Daughters of the American Revolution where this would be

10 interesting to them in a historical sense.

11     This is an organization that engages in education on

12 energy issues and how the government works.  And for them to

13 succeed in their mission, they obtain records under FOIA and

14 various other statutes.  And they're a research and educational

15 organization and they need this information to complete their

16 mission.

17     Their mission benefits the public as a charity, but it's

18 not necessarily serving the public interest it's still their

19 interest in the organization.

20          THE COURT:  Okay, and then what would you say to the

21 State Department's concern about surging resources to your

22 situation is going to cause harm to all the other people in the

23 queue?

24          MR. HARDIN:  We tried to mitigate that as much as

25 possible by not seeking preliminary relief as to the entire

1    universe of documents.

2       I think the State Department's status reports indicate

3    that there are a lot of documents that are potentially

4    responsive, but when they get down to whether they actually are

5    or not it's a much smaller universe.  We're only seeking a

6    very, very small universe of documents by way of this

7    preliminary injunction. So the burden to produce those very few

8    documents should be quite light.

9       I also think that if you look at their affidavit they're

10   saying that they're struggling to process requests and courts

11   across the country are ordering them to process requests in

12   certain time frames.  I think that that indicates essentially

13   that the State Department without court orders isn't processing

14   requests.  And that's why courts have had to step in over and

15   over again.

16      We can't use the sort of logic that because other judges

17   have ordered the State Department to produce records more

18   quickly this Court can't.  I think that at some level that just

19   is sort of a get out of jail free card for the government that

20   they can't be forced to produce documents because other courts

21   have made them produce documents.

22          THE COURT:  Do you quibble with the State

23   Departments's decision about not forcing workers to return or

24   are you just saying that the way they've allocated the work

25   amongst those few employees who have returned is inequitable to

1   you?

2          MR. HARDIN:  I don't think that it is Plaintiff's

3   place to tell the government how to run its FOIA operations on

4   a microscopic level.  I do think the State Department has

5   unique challenges and they pointed them out about they have

6   records that are usually processed in person because of

7   classification concerns.  We're certainly sympathetic to that.

8          If this were March when nobody could process records and

9   nobody could come in, I would understand why records weren't

10  being processed.  What we figured out is the State Department

11  can process requests and what method they use to process the

12  requests is really up to them and their expertise.  If they are

13  processing requests, I think this is certainly a request that

14  should be processed.  It's available through their affidavit.

15         I understand that they have these in person workers, the

16  few that they have, process this request at least at an

17  equivalent rate to process the other request.  And that's

18  certainly an avenue that's open to them, but I'm not insisting

19  on any particular method of handling our request.

20         I think that the likelihood of these documents being

21  classified or sensitive is probably low, although that may not

22  solve the problem considering that the servers themselves are

23  protected as opposed to individual documents.

24         THE COURT:  Okay, thank you Mr. Hardin.

25         AUSA Burch I'll hear from you.

1          MR. BURCH:  Thank you, Your Honor.

2      I wanted to address first though the Court's question

3  about how long would it take and then I wanted to talk a little

4  bit about the impact of putting it in the expedited queue and

5  then finally couple points about the balance of equities under

6  the PI standards.

7      With respect to the Court's question about how long it

8  would take to process the five documents noted in Plaintiff's

9  filing in footnote 22.  The first thing as we explained in the

10  declaration, two of those records have already been produced.

11  So it's really just a matter of three.

12      It is difficult to provide any kind of reliable estimate.

13  The best I can kind of wrangle out of the steps is probably a

14  month would be an optimistic time period.  Let me break that

15  down for you.

16      There were two basic steps, the first is the processing

17  within the FOIA office.  Then there would be processing by the

18  bureaus within the State Department that it might have equities

19  in their records.  So with respect to the first step, the

20  processing by the FOIA office.  As the declaration explains,

21  there are very few of these retired employee annuitants who

22  have returned to work and are capable of working on a

23  classified system.  I think up to 20 percent have returned.

24  Most of those are working part-time.  So it's the 20% that

25  overstates the capacity that they have relative to normal time.

1        They are all working or primarily or I should say to start

2   with on matters that they have already been assigned to so that

3   they don't have to come up to speed.  The declaration explains

4   the decision was made in order to make sure that the people who

5   were working were working as efficiently as possible.  To the

6   extent that those folks have access capacity, they will be

7   assigned to be working on matters that are almost done or

8   matters that for which the department has granted expedited

9   process or in order to do expedited processing.

10       So it's hard to predict when that capacity would open up

11  to turn to this request because as the declaration explains,

12  there's no one who is now at the office who was working on this

13  before.  The only way we'd proceed to turn to this would be --

14  (audio indiscernible)

15       Once that happens, it would go relatively quickly in terms

16  of identifying the three records.  Presumably they're already

17  loaded into the system.  Presumably the review for redaction

18  won't take too terribly long, just a few days.  But then there

19  would need to be a government review and then legal review

20  before it could clear the FOIA processing office.

21       At that point, it would move onto the second step and be

22  sent out to any bureau that would have equities.  It seems

23  likely that there is going to be at least one office within the

24  State Department that would have interest in it.  It's hard to

25  predict how long that would take in part because it is unclear

1  whether the documents would have any classified information in

2  it.   If there were any classified information in these records,

3  then the review by the interested bureau would need to have an

4  on-sight which would slow the process down further.  So it's

5  very difficult to predict the bottom line how long this would

6  take.  But that's about as clear of an answer I can provide

7  based on information available.

8          THE COURT:  Thank you Mr. Burch.  So that one month

9  prediction and recognizing that that is a guesstimate.

10         MR. BURCH:  Yes.

11         THE COURT:  But that one month prediction is not

12 everybody dropping everything and turning to this, but having

13 someone who has access capacity handling this in the normal

14 process, in the normal course?

15         MR. BURCH:  Right, in the normal course for a request

16 that has been granted expedited processing.

17         THE COURT:  Okay, I'll tell you Mr. Burch.  I'm not

18 leaning towards granting a PI, but I am troubled that we've

19 just been pinned down with the State Department for months and

20 months now on this request with no end in sight.

21   I do understand there's a certain logic in how the State

22 Department has decided to proceed, but I am troubled by this

23 the specter of this case just sitting indefinitely here.  And

24 again I need to figure out some way to get this back on track

25 somehow.  I don't think obviously the State Department made the

1   decision to hire a bunch of retirees in this current

2   environment, maybe that's not the wisest way to proceed.  Maybe

3   they should be looking to augment that staff somehow.

4        Obviously like Mr. Hardin it's not my job to micromanage

5   the State Department, but to the extent that that's the policy

6   they've come up with is leaving plaintiffs like Energy Policy

7   Advocates without any relief whatsoever that that strikes me as

8   problematic.

9            MR. BURCH:  Well I can tell you, Your Honor, the use

10  of the retired employee annuitants prior to the pandemic has

11  been, has made a lot of sense because of the expertise

12  involved.  And it is both difficult to find that expertise and

13  it's my experience with the government generally.  I mean it's

14  unusual to have that level of expertise to do processing and it

15  generally makes an awful lot of sense.

16       With respect to the pandemic, the agency has been

17  extremely busy in redesigning its response.  And it has, as

18  I've explained, made major changes in how it's gone about

19  things.  Including trying to stand up to the efficient system

20  model.  Although there are practical problems that they manage.

21  They maybe from moving from one system to the other.

22       I can tell you that the State department has in the works

23  further plans.  I don't know which might continue to evolve

24  their process.  They're not at the point now where I can go

25  into any detail.  I'm not authorized to say.  They expect to

1  make some sort of announcement perhaps in as soon as 30 days

2  form now on further changes they'll be making, but those

3  certainly aren't going to be in place by the election.

4       It's very difficult to run a shop of this size and it is

5  an enormous shop.  It has over 10,000 FOIA requests pending,

6  and there are going to be an awful lot of requests

7  unfortunately that will be in the same position as Plaintiff's

8  request; which is to say that there won't be a retired employee

9  annuitant available at least for the short term to work on

10  requests.

11       In light of that reality, I think the declaration does a

12  pretty good job of explaining the State departments's thinking

13  and I think that their thinking makes an awful lot of sense.

14  They are trying to get every last bit of efficiency that they

15  can out of the existing capacity they have.  And that explains

16  why they are not going to be reassigning matters unless those

17  matters are properly put into the expedited queue.

18          THE COURT:  Mr. Burch, can you discuss the merits

19  briefly and specifically the claim in the reply from Mr. Hardin

20  that we have.  That the expedited, the concern about expedition

21  was based on the November, 2020 deadline from the President?

22          MR. BURCH:  So what Plaintiff is leaving out is that

23  the FOIA statute provided very quick and ready access to the

24  courts on either the denial of the request for expedited

25  processing which I understand from the email he sent me this

1   morning that he never received or the expiration of the

2   statutory time period for the agency to respond.

3        Plaintiff had an open door to the Court to seek review of

4   the expedited processing request either by denial or inaction

5   from the agency over a year ago.  So to the extent that there's

6   a question of diligence.  Plaintiff -- certainly there's a

7   tremendous responsibility from waiting as long as it has to

8   raise the matter.

9        I might also add that it's important I think in analyzing

10  the balance of equities to take a look at the practical

11  reality.  If the Court were to order expedited processing or

12  some other order that resulted in processing of the three

13  documents, that would only lead to the agency going public with

14  its decision on the redactions.

15       And based on the two documents among the five that have

16  already been produced which were heavily redacted.  Based on

17  the nature of the request which is to say internal State

18  Department ego analysis as to whether this qualifies as truly

19  of the constitution.

20       It is overwhelmingly likely that the information Plaintiff

21  sought will be exempt and will be withheld.  And Plaintiff will

22  not be able to realize any of the benefits that it is claiming

23  unless that information is made public, not just that the

24  processing happens.  And I would submit that even if Plaintiff

25  were to overcome the attorney-client privilege and other

1  privileges likely to apply, that it would take months of

2  adjudication for that position to be upheld; factoring in the

3  possibility of appellate review.

4  All of this time frame anyone can imagine a case like that

5  taking another six to twelve months.  That would have not been

6  crazy realistic had Plaintiff gotten started last summer when

7  it was first available to go to the District Court and seek

8  review of what it perceived to be the inaction on its request

9  for expedited process.

10  But by waiting until now, it's all but impossible to see

11  it halfway by which Plaintiff could get this information into

12  the public domain by the election. This is putting aside the --

13  this is all assuming the information matters to the election in

14  the way the Plaintiff has mischaracterized.

15  I think your questions to Mr. Hardin were spot on in terms

16  of identifying the weaknesses in that theory.  I would point to

17  the Plaintiff's reply which had essentially no response to the

18  government's argument on that point; that does not appear to be

19  any disagreement among the political parties or presidential

20  candidate as to whether it should be treated as a treaty or

21  not.  It may well be of great public interest at a high level

22  generality, but a treaty or not or an agreement clearly on the

23  merits of it.

24  But as to the specific question as to how the State

25  Department's legal analysis treated it, there's been no

1  evidence in the record that that is likely to be not only a

2  major issue in the presidential election, but even a noticeable

3  issue in the presidential election.

4      So the practicality just does not add up to this being in

5  any way worth it to put this one at the front of the line when

6  it just seems like all but impossible that the information

7  would get out.

8            THE COURT:  Okay, anything further Mr. Burch?

9            MR. BURCH:  No.

10           THE COURT:  Mr. Hardin, I'll give you the last word.

11           MR. HARDIN:  Thank you, Your Honor.

12     I just want to clear up the State Department is arguing

13 that the documents will likely be exempt and I think a proper

14 analysis that is going to require actually looking at the

15 documents, we have reason to believe that they're not going to

16 be exempt which is why they were requested under FOIA.  And the

17 Court could; for example, set a deadline that says these

18 documents will be submitted for in camera review with a

19 briefing explaining any redactions or not and the case could

20 still be adjudicated rather quickly.

21     I think that what we see in the arguments that because the

22 State Department believes that these records are exempt that

23 production will necessarily take months including appellate

24 review just shows that the Department has determined one way or

25 another to avoid producing documents or even the process to

1  request.  I think that's our concern.  That's why we're here

2  asking the Court to compel at least processing.  Eventually if

3  they do claim redactions, I think a schedule to resolve those

4  disputes would be appropriate, but first we have to process the

5  documents.  Thank you, Your Honor.

6           THE COURT:  Thank you.

7       I'm ready to rule.  Before me is the Plaintiff's motion

8  for Preliminary Injunction.  Upon consideration of the motion,

9  relevant law, related legal memoranda in opposition and

10 support, the record, and the arguments of counsel here today,

11 for the reasons that follow, I will deny the Plaintiff's

12 motion.

13      In this oral ruling all page citations refer to the page

14 numbers that the CM/ECF system generates.

15      This case arises from a June 7th, 2019 FOIA request to the

16 State Department.  The FOIA request seeks records related to

17 the Obama Administration's decision not to designate the 2015

18 Paris Climate Agreement as a treaty.  The FOIA request consists

19 of 7 subparts.

20      The Energy Policy Advocates sought expedited processing

21 for its FOIA request.  On June 29th, 2019, the State Department

22 now asserts that it sent a letter acknowledging the FOIA

23 request and denying the request for expedited processing.  I'm

24 looking to the Defendant's opposition Exhibit Number 2 page 1

25 ECF number 20-2.  The State Department informed the Advocates

1  that the FOIA request failed to demonstrate a compelling need.

2      I recognize that apparently the Plaintiff did not receive

3  that letter or at least was unaware of it until just within the

4  last few days.

5      This lawsuit has been ongoing for less than a year.  The

6  State Department has completed most of its searches and

7  identified a little more than 10,000 pages of responsive

8  records according to its opposition page 7.  Thus far, it has

9  made two separate productions totaling almost 200 pages

10  including all responsive records for subparts 5 and 6 of the

11  FOIA request.  I'm looking to pages 7 and 8 of the Defendant's

12  Opposition.

13      The State Department has represented in the past two Joint

14  Status Reports that it has been unable to continue processing

15  the FOIA request due to the COVID-19 pandemic.

16      In the most resent Joint Status Report, the State

17  Department stated that a limited number of State Department

18  FOIA personnel have returned to work on a part-time basis, but

19  none were previously assigned to this FOIA request.  That's

20  from the JSR at page 2 ECF number 17.

21      The Advocates then filed this motion for a preliminary

22  injunction two weeks later.  In its motion, the Advocates urged

23  the Court to order the State Department to begin expedited

24  processing and to produce records responsive to subparts 2-6 of

25  this request no later than October 15th, 2020.

1          It claims that this condensed schedule is necessary

2    because the requested information will inform a decision the

3    voters are now being asked to make in the 2020 presidential

4    election in November.

5          Specifically, the Advocates claim that the requested

6    records will allow voters to assess the propriety of a promise

7    by Joe Biden to re-enter the Paris Climate Agreement.  And

8    that's from the motion for a PI at page 3.  It points to a

9    single news article covering Biden's desire to re-commit the

10   United States to the Paris Climate Agreement in January of

11   2021.  That's looking to their motion page 4.

12         According to the Advocates, the requested information will

13   be "legally stale" after the presidential election.  That's at

14   page 5.

15         Having been fully briefed, and with counsel having given

16   arguments here today, the motion for a preliminary injunction

17   is ripe for disposition.

18         Looking first to the standards that govern a preliminary

19   injunction.  A preliminary injunction is an extraordinary

20   remedy never awarded as of right.  That's according to Winter

21   v. National Resources Defense Council 555 U.S. 7 page 24 from

22   2008.  The Supreme Court has described it as a drastic remedy

23   that should be granted, that should not be granted unless the

24   movant, by a clear showing, carries the burden of persuasion.

25   That's from Mazurek v. Armstrong, 520 U.S. 968 page 972 from

1  1997.

2      A plaintiff seeking this remedy has the burden of showing

3  four factors.  First, it must show that it's likely to succeed

4  on the merits.  Second, that it will likely suffer irreparable

5  harm in the absence of preliminary relief.  Third, that the

6  balance of equities tips in its favor.  And fourth, that an

7  injunction is in the public interest.  That's from Winter page

8  20.  The third and fourth factors merge when the Government is

9  the opposing party.  That's from Nken v. Holder, 556 U.S. 418

10  page 434 and 35 in 2009.

11      A movant's failure to show any irreparable harm is grounds

12  for refusing to issue a preliminary injunction, even if the

13  other three factors entering the calculus merit such relief.

14  That's from Chaplaincy of Full Gospel Churches v. England, 454

15  F.3d 290, page 297 out of the D.C. Circuit in 2006.

16      Several well-settled principles govern analysis of the

17  irreparable harm factor.  The plaintiff's injury "must be both

18  certain and great, as well as actual and theoretical." That's

19  from Wisconsin Gas Company v. FERC, 758 F.2d, 669 page 674 out

20  of the D.C. Circuit in 1985.  The case goes on to say,

21  "injunctive relief will not be granted against something merely

22  feared as liable to occur at some indefinite time."

23      A plaintiff's injury must be "of such imminence that there

24  is a clear and present need for equitable relief to prevent

25  irreparable harm." The possibility that corrective relief will

1  be available at a later date in the ordinary course of

2  litigation weighs heavily against a claim of irreparable harm.

3  It is up to the movant to quote, substantiate the claim that

4  irreparable injury is likely to occur."

5      "Bare allegations of what is likely to occur is of no

6  value since the court must decide whether the harm will in fact

7  occur. The movant must provide proof that the harm is certain

8  to occur in the near future.  Further, the movant must show

9  that the alleged harm will directly result from the action

10 which the movant seeks to enjoin." Again from page 674.

11     This motion seeks much the same relief requested in the

12 complaint, that the State Department produced non-exempt

13 responsive records.  But in this motion, the Advocates seek an

14 expedited production deadline of October 15th, 2020.  These are

15 in itself strikes against the motion.

16     The D.C. Circuit has cautioned that a preliminary

17 injunction generally should not work to give a party

18 essentially the full relief he seeks on the merits.  That's

19 from Dorfmann v. Boozer, 414, F.2d 1168, page 1173 note 13 from

20 1969.

21     More, while it is always true that issuing a preliminary

22 injunction should be "sparingly exercised," this is especially

23 so when, as here, the requested injunction is a mandatory one

24 that commands some positive act and thus alters the status quo.

25 That's from Dorfmann at page 1173.

1     Beyond this statement in Dorfmann, the D.C. Circuit has

2  not resolved whether the standard applicable to a mandatory

3  preliminary injunction is higher than that applicable to a

4  prohibitory preliminary injunction. I'm looking for that to

5  Friends for All Children v. Lockheed 746 F.2d, 816, page 834

6  note 31 from the D.C. Circuit in 1984.

7     But decisions from this District have applied a higher

8  standard.  Specifically, the party seeking a mandatory

9  injunction must show clearly that it is entitled to relief or

10 that extreme or very serious damage will result from the denial

11 of the injunction.  That's from the Columbia Hospital for Women

12 Foundation v. Bank of Tokyo-Mitsubishi 15 F. Supp. 2d 1 page 4

13 from 1997.  And I'm also looking to EPIC v. DOJ, 15 F. Supp 3d

14 32, page 39 from 2014 which collects cases.

15    The Second, Fourth, and Tenth Circuits also apply a

16 heightened standard for mandatory preliminary injunctions.  I'm

17 looking for that Daily Caller v. U.S. Department of State.  152

18 F. Supp.3d 1 page 6 note 4 from 2015 which also collects cases.

19    Given these authorities, it is worth noting here that

20 Energy Policy Advocates seeks a mandatory preliminary

21 injunction that would afford a full relief for most its FOIA

22 request.  I need not decide now if a higher standard applies to

23 such a request as has been imposed by many of my colleagues.

24 For even under the standards that normally apply to preliminary

25 injunctions, Plaintiff is not entitled to the relief it

1   currently seeks.

2       Before turning to the four preliminary injunction factors,

3   I want to note that I'm disappointed about the failure to

4   comply with the meet and confer requirement of Local Rule 7(m).

5   This rule is intended to "promote the resolution of as many

6   litigation disputes as possible without court intervention, or

7   at least to force the parties to narrow the issues that must be

8   brought to the Court".  That's from Ellipso v. Mann, 460 F.

9   Supp. 2d.99, page 102 out of this District in 2006.

10      The present motion provides no certification that the

11  Plaintiff conferred with the State Department before filing.

12  And the passing reference in the Joint Status Report that the

13  Advocates anticipate filing a motion in the coming days to seek

14  an order setting a production schedule does not satisfy Rule

15  7(m).

16      I think it's clear that there's been some miscommunication

17  here including about whether or not an expedited, the Plaintiff

18  ever received a response to its request for expedited

19  processing.  And it occurs to me that issues like that may well

20  have been resolved had there been more communication between

21  the parties before briefing began.

22      I could deny the motion for failure to comply with Rule

23  7(m), but I will not do so here because there are more

24  compelling reasons that justify denying the motion.  Indeed,

25  all four factors weigh against granting the motion for

1    preliminary injunction.

2        Although a closer call than the other factors, I conclude

3    that Energy Policy Advocates has not demonstrated that it is

4    likely to succeed on the merits because the FOIA request does

5    not establish a basis for expedited processing.  The State

6    Department has already denied the initial request for expedited

7    processing.

8        I must review that decision de novo according to Al-Fayed

9    v. CIA 254 F.3d 300, page 304 out of the D.C. Circuit in 2001.

10   I looked to the record before the agency at the time of the

11   determination, according to 5 U.S.C. 552(a)(6)(E)(iii).  Thus,

12   the June 19, 2019 FOIA request must meet the requirements for

13   expedited processing.

14       Under FOIA, a requester is entitled to expedited

15   processing if it shows a compelling need for the information.

16   A compelling need exists if (1), the requester is primarily

17   engaged in disseminating information.  And (2), there's an

18   urgency to inform the public concerning actual or alleged

19   Federal Government activity.  That's according to

20   552(a(6)(E)(v).

21       Under expedited processing, the agency must process the

22   records as soon as practicable.

23       The FOIA request establishes that Energy Policy Advocates

24   is primarily engaged in disseminating information which is the

25   first requirement for expedited processing.  The FOIA request

1  states that the Energy Policy Advocates has "research and

2  public functions as part of its transparency initiative seeking

3  to learn and educate the public on environmental and energy

4  policy." From the Defendant's Opposition Exhibit 1 page 1.

5       It also represents that the Advocates's core functions

6  include broad dissemination of public information obtained

7  under open records and freedom of information laws by serving

8  as a resource to the media to disseminate our findings.

9       But the FOIA request fails to demonstrate an "urgency to

10  inform the public," which is the second requirement for

11  expedited processing.

12       On that, courts must consider three factors:  (1) whether

13  the request concerns a matter of current exigency to the

14  American public; (2) whether the consequences of delaying a

15  response would compromise a significant recognized interest or

16  compromise a significant recognized interest; and (3) whether

17  the request concerns federal government activity.  I'm looking

18  to that at Al-Fayed at page 310.  The first two Al-Fayed

19  factors are absent here.

20       The FOIA request does not rely on the 2020 presidential

21  election for expedited processing.  Instead, it explains that

22  the information will "reveal the mechanics" of the Obama

23  Administration's decision not to designate the Paris Climate

24  Agreement as a treaty.  I'm looking to the Defendant's

25  Opposition Exhibit 1, page 4.

1    But this is a historical decision that took place multiple

2  years before the FOIA request.  It does not qualify as a

3  current exigency under Al-Fayed at page 310.  There the

4  Al-Fayed Court said, "All of the events and alleged events

5  occurred two to three years before plaintiffs made their

6  requests for expedited processing.  Although these topics may

7  continue to be newsworthy, none of the events at issue is the

8  subject of a current unfolding story."

9    The FOIA request also refers to an announcement for

10  President Trump that he will withdraw from the Paris Climate

11  Agreement on or before November 8th, 2020.  It states that

12  "history and media behavior generally suggest that this will,

13  therefore, be an issue of intense public debate." And that's

14  from page 5, Defense Opposition Exhibit 1.

15    In my mind, this statement is conclusory and speculative.

16  There's no evidence that at the time of the FOIA request, there

17  was media coverage of this announcement, let alone that it was

18  of current exigency to the American public.  At best, Plaintiff

19  suggest the Agreement will become an issue of intense public

20  debate.  But this conjecture is insufficient.  I look to

21  Progress v. CFPB, 2017 Westlaw 1750263 *5 out of this District

22  from May 4th, 2017, which denied a preliminary injunction

23  motion seeking expedited processing because "the record is

24  devoid of any evidence regarding whether the Prepaid Rule or

25  Congressional action with respect to the Prepaid Rule, is a

1  matter of current exigency to the American public."

2      More, this FOIA request focuses on a procedural point

3  about the Paris Agreement, which is not the substance of the

4  Agreement itself which from any of the articles that I've seen

5  flagged, it seems to be what any public debate would likely be

6  about.

7      Absent from this FOIA request is any explanation of how

8  the subject matter is "central to a pressing issue of the day,

9  such as a public debate over the renewal of the USA PATRIOT

10  Act, a breaking news story about domestic surveillance of

11  anti-war protesters, and an active debate over the

12  reauthorization of certain Voting Rights Act provisions."  From

13  Wadelton v. Department of State 941 F. Supp. 2d 120, page 123,

14  out of this District from 2013.

15      Even if the FOIA request had relied on the upcoming

16  presidential election to justify expedited processing, that

17  alone may not have been enough.  Given the breadth of issues at

18  play in the presidential election, such a justification would

19  likely sweep almost any FOIA request into the ambit of urgency

20  since FOIA requests are regularly designed to elicit

21  information about how the government is performing its work.

22  That's according to Landmark Legal Foundation v. EPA 910, F.

23  Supp. 2d 270, page 277 out of this District from 2012.

24      The FOIA request also fails to identify how the

25  consequences of delaying a response would compromise a

1  significant recognized interest at stake.  That's from Al-Fayed

2  page 310.

3      As the advocates claim, any debate of the Paris Climate

4  Agreement must be an informed one.  But the public's right to

5  know, although a significant and important value, would not by

6  itself be sufficient to satisfy this standard, according to

7  Al-Fayed page 310.

8      I note that this, the merits question is not dispositive

9  to my ruling.  Even if I'm mistaken about this merits analysis,

10 I would still deny the motion for preliminary injunction based

11 on the remaining factors.

12     Turning next to the irreparable harm prong.  Energy Policy

13 Advocates suggest that the loss or abridgement of a right under

14 the FOIA statute constitutes per se irreparable harm in its

15 motion page 14.  But as I believe counsel admits here, none of

16 the authority cited by the Advocates supports this far reaching

17 proposition.  Indeed, this argument would ignore all of the

18 decisions in this District denying requests for preliminary

19 injunctions in FOIA cases because the Plaintiff did not

20 establish irreparable harm.  I'm looking to the Daily Caller

21 152 F. Supp. 3d, page 13.

22     In any event, I would reject that argument.  Preliminary

23 injunctions are suppose to be extraordinary remedies.  This

24 District deals with hundreds of FOIA cases each year, many of

25 which involve allegations that the government is in breach of

1  its production requirements under the statute.  Preliminary

2  injunctions cannot be justified simply because the government

3  agency has missed a FOIA discovery timeline.

4       According to the Plaintiff, it is essential that the

5  public be allowed to know the facts behind how these candidates

6  for high office claim they can re-enter the Paris Climate

7  Agreement.  And I'm looking for that to the Plaintiff's motion

8  page 15.  Plaintiff claims that after the November election

9  this information "will no longer be available to influence

10  voters' decisions on this issue for which candidates are asking

11  for their votes."  Also from page 15.

12       I find that the Energy Policy Advocates's broad assertions

13  are insufficient to establish irreparable harm for several

14  reasons.  First, Plaintiffs do not clearly show how it will

15  suffer irreparable harm. Its arguments seem to focus only on

16  the perceived harm to the public and voters.  It is true that

17  other judges in this District have granted preliminary

18  injunctions in FOIA cases when the records are sought to inform

19  an ongoing or imminent public debate.  And I'm looking to the

20  Center for Public Integrity v. DoD 411 F. Supp. 3d 5 page 10

21  out of this District in 2019 which collects cases.

22       But to my mind, this line of cases if some tension with

23  the well settled principle that a Plaintiff must show it will

24  likely suffer irreparable harm after the preliminary

25  injunction.  As the Supreme Court phrased it in Winter, "a

1   plaintiff seeking a preliminary injunction must establish that

2   he is likely to suffer irreparable harm." Page 20.  Indeed,

3   the third factor -- balance of the equities -- is sometimes

4   framed in terms of whether an injunction would substantially

5   injure third parties reinforcing that the second factor, the

6   irreparable harm question is not concerned with injuries to

7   third parties.  For that proposition I look to Chaplaincy of

8   Full Gospel Churches, 454 F.3d, page 297.

9        Energy Policy Advocates's arguments focus only on the

10  public and voters.  For example, it claims that this will be

11  the publics, "only opportunity to examine or challenge either

12  candidate's position on the Paris Agreement." From the

13  Plaintiff's motion page 15.

14       Plaintiffs uses state and federal open records law to shed

15  light on the operations of the government, and thereby also

16  educates the public.  That's from paragraph 12 from its

17  complaint.  It is not argue irreparable harm based on an

18  inability to educate the public or provide unique analysis on

19  the subject matter of its FOIA request. And I do not see any

20  clear showing that it has some sort of unique interest in the

21  information sought.

22       The motion only includes a conclusory statement that

23  Energy Policy Advocates will be irreparably harmed.  I'm

24  looking to page 14 of its motion.  But such bare allegations of

25  what is likely to occur are of no value according to Wisconsin

1  Gas 758 F. 2d at 674.  This failing distinguishes this case

2  from other instances where a FOIA plaintiff includes

3  declarations or other evidence showing the centrality of quick

4  dissemination of specific information to its mission.

5      Plaintiff fails to clearly show that it will suffer

6  irreparable harm is a threshold problem.  But in recognition of

7  decisions in this District that have granted preliminary

8  injunctions in FOIA cases without a plaintiff-specific showing,

9  I do not find this threshold problem dispositive.  There are

10  other problems that also weigh against the finding of

11  irreparable harm.

12      Second, I find that the Advocates have not established

13  harm that would be, "certain," a fundamental prerequisite for a

14  preliminary injunction motion according to Wisconsin Gas page

15  674.

16      The motion rests on the theory that the information is

17  needed for voters to assess the candidates' positions on the

18  Paris Climate Agreement.  The Plaintiff points to a single news

19  article and claims presidential candidate Joe Biden promises to

20  re-enter the Paris Agreement in January 2021 if he's elected.

21  Relying on this article, Plaintiff argues that, "it is

22  essential that public be allowed to know the facts behind how

23  these candidates for high office can make this commitment if

24  elected." Page 15.  But it's theory of irreparable harm is

25  untenable in several requests.

1        First, the purported injury is theoretical, not actual.

2   At this time, the remarks of a presidential candidate on the

3   campaign trail are just that -- remarks.  They do not

4   constitute actual policy that is, "certain to occur in the near

5   future."  From Wisconsin gas, page 674.

6        It's also highly questionable that the information becomes

7   stale after the November election, as the Plaintiff suggests.

8   Recall that the Trump Administration pulled the Nation out of

9   the Paris Climate Agreement after it was originally endorsed by

10  President Obama.  And it is plausible that future

11  administrations will do the same.  This means the November

12  election is not some once-and-for-all decision point.  Even if

13  President Biden entered the country back into the Agreement,

14  the information that the Plaintiff seeks to make apparent to

15  the public could later convince a President Biden or any other

16  President to subsequently withdraw again from the Agreement, as

17  this administration has already done.

18        There are also academic and historical value in

19  understanding the analysis used to determine when an agreement

20  is considered a treaty.  That value is not lost after the

21  November election.

22        Finally, Plaintiff does not show how the alleged harm will

23  directly result from the action which it seeks to enjoin.

24  Looking to Wisconsin Gas page 674 again.  It claims that

25  records at issue in this case will inform a decision the voters

1  are now being asked to make.  Specifically, that the propriety

2  of a promise by one candidate to re-enter the Paris Agreement.

3  Looking to the Plaintiff's motion page 3.  But the requested

4  information relates to the Obama Administration's decision not

5  to designate the Paris Climate Agreement as a treaty.  I'm

6  looking at two, pages 6 - 9 of its motion.  These are two

7  separate issues.  Whether to enter or re-enter an agreement as

8  a  good public policy is distinct, in my mind, from whether to

9  consider that agreement a treaty as opposed to an executive

10 agreement.

11      Indeed, it is possible that Joe Biden, if elected, will

12 take a different approach than the Obama Administration and

13 actually seek Senate approval before re-entering the Paris

14 Climate Agreement.  It is similarly possible that President

15 Trump agrees with the Obama Administration that the Paris

16 Climate Agreement should not be considered a treaty, but

17 disagrees on whether the U.S. should be a party to that

18 Agreement in the first place.

19      Thus, it is unclear how a failure to receive this

20 information will deprive the voters of their ability to assess

21 a candidate's position on whether it is good public policy for

22 the U.S. to join the Paris Climate Agreement.

23      In short, this FOIA request is focused on a picayune

24 procedural aspect of the Paris Agreement and Plaintiff has

25 failed to show A, that this aspect of the agreement is being

1 publicly debated as opposed to an ongoing debate about the

2 merits of the agreement.  B, that either presidential candidate

3 agree with the Obama Administration on this analysis or C, that

4 the outcome of the November election will definitively resolve

5 this question.

6       Third, the State Department has already completed two of

7 the five subparts that the Plaintiff request be produced by

8 October.  And I'm looking to the Stein Declaration, paragraph

9 35.  In total, the State Department has produced nearly 200

10 responsive pages.  This means that the Plaintiff has not been

11 entirely stymied in its request, as the Daily Caller, page 14

12 considers.

13       A preliminary injunction is extraordinary relief reserved

14 only for irreparable harm that is both concrete and certain.

15 Plaintiff has failed to establish that harm here.

16       The D.C. Circuit precedent allows me to deny the motion on

17 this ground alone.  I'm looking to Chaplaincy of Full Gospel

18 Churches page 297.  I do find that the irreparable harm prong

19 alone justifies denial of the motion.

20       But I also find that the third and fourth factors, the

21 balance of equities and public interest also weigh against

22 granting this extraordinary relief.

23       Plaintiff argues that the State Department has already

24 started processing FOIA requests in other cases and faces no

25 discernible hardship by being compelled to at long last satisfy

1    this FOIA request.  I'm looking to page 16 of the Plaintiff's

2    motion.  It claims that the State Department can handle

3    expedited processing with "relative ease." Page 17.  I

4    disagree.

5        The Plaintiff's unsubstantiated claim is squarely

6    contradicted by the detailed declaration from the State

7    Department which highlights the various ways in which the

8    increase in FOIA litigation and recent COVID-19 pandemic has

9    strained its FOIA processing capabilities.  I'm looking to

10   paragraph 16-48 of the Stein Declaration.

11       As of now only 20% of the State Department's FOIA

12   processing personnel have returned to in-person work on a

13   part-time basis, according to paragraph 29.  And none of these

14   personnel were previously assigned to this case, according to

15   paragraph 33.

16       The State Department must prioritize its limited

17   resources.  For now, it's decided to focus on two types of

18   cases: (1) cases for which all processing of classified and

19   unclassified information is almost complete; and (2), cases

20   involving requests for which the State Department has granted

21   expedited processing.  That's from paragraph 31.  This case

22   does not meet either criteria.

23       I understand Plaintiff's frustration with the current

24   situation in that its request isn't being processed just

25   because its reviewers haven't come back to work yet.  I believe

1  this issue is best addressed through a production order though,

2  not under the preliminary injunction rubric.

3      I find that an order compelling expedited processing by

4  October 15th, 2020, a little more than one month from now,

5  would impose an undue hardship on the State Department and its

6  already strained resources.  And I'm looking to paragraph 36 of

7  the Stein Declaration for that.

8      I also find that a preliminary injunction would disrupt

9  the public's interest in the orderly, fair, and efficient

10 administration of FOIA.  I'm looking for that in Nation

11 Magazine v. State 805 F. Supp. 68, page 74 from 1992.

12     Allowing Plaintiff to "jump to the head of the line would

13 upset the agency's processes and be detrimental to the other

14 expedited requesters, some of who may have even more pressing

15 need." From EPIC, page 47.

16     Time spent responding to this FOIA request "comes at the

17 expense of all other requesters seeking information" from the

18 State Department including those who were already granted

19 expedited processing.  That's from the Stein Declaration,

20 paragraph 43.

21     Requiring review and production in a one-month timeframe

22 also threatens to risk disclosure of statutory exempt material,

23 according to the Defendant's Opposition at page 24.  This is

24 especially so considering the State Department's limited and

25 strained FOIA processing capabilities.  I'm looking for that to

1  Protect Democracy Project 253 F. Supp. 3d, page 302.

2      These two considerations -- harms to other FOIA requesters

3  and the risk of incomplete redactions weigh against a

4  preliminary injunction.  I'm looking for that to Daily Caller,

5  page 14.

6       For all of these reasons, I conclude that Energy Policy

7  Advocates is not entitled to the extraordinary relief of a

8  preliminary injunction in this case.  I will thus deny the

9  motion and issue an order to that effect shortly.

10     I do, however, want to figure out a way to get this case

11 back on track, particularly as to the documents in footnote 22.

12     Mr. Burch, I guess I'd like to figure out if we can get

13 those documents processed by October 15th.  I think I

14 understand there's three documents there and I don't think it's

15 appropriate for us to just stop things all together on this

16 case until the FOIA process service for this case come back on

17 line.

18     So I'm happy to hear from you if you want to suggest a

19 different way forward, but I think that would be my inclination

20 is to order the process of those three documents before October

21 15th.

22        MR. BURCH:  Yes, I'm constrained in being able to

23 count on how realistic that is.  What would be -- the order was

24 not based on the expedited processing statute or on the

25 preliminary injunction statute.  What would be the legal basis

1   for the order then?

2          THE COURT:  I have production orders in many, if not,

3   most of my FOIA cases.  I believe I had one in this one until

4   COVID.  I've been willing to stop those during COVID, but we're

5   now I believe six months after things went at the whole State

6   Department.  Most of the rest of the government is figuring out

7   a way to move forward.  I suspect the State Department needs to

8   as well.

9          MR. BURCH:  If I could have just a moment.  Well, if

10  I could, I guess I would ask for a couple days to make a filing

11  on that, Your Honor, if that would be acceptable.  I'm

12  reluctant to accede to it without further consultation with the

13  agency.

14         THE COURT:  Yes, that's fine.  I think what I'm

15  envisioning here Mr. Burch is a best efforts.  If it turns out

16  particularly through consultation with other offices within the

17  State Department that this is taking longer than expected, then

18  I can imagine a situation in which there's a follow up

19  declaration explaining why the department is not able to meet

20  that timeline.  But on its face, over a month for three

21  documents strikes me as reasonable and I'd like the department

22  to try to get that done.

23         MR. BURCH:  We can certainly make best efforts by

24  then. I would just for the record, Your Honor, I would point

25  out that there are an enormous number of requests that are

1  similarly not being processed.  And I think the agency

2  recognizing that is the case that it's reasonable and sound.

3  But we can certainly make best efforts by October 15th.  I'll

4  be able to provide some explanation.

5          THE COURT:  Yes, I think that's what I have in mind.

6  Mr. Hardin, do you want to say anything on that point?

7          MR. HARDIN:  I think that an order that says that

8  they could produce the three records by October 15th or file a

9  declaration documenting their inability to do so would be

10  appropriate.

11          THE COURT:  Okay, so I will enter an order to that

12  extent.  I'll ask the parties to continue and perhaps step up

13  their communication so that we're making sure that there's less

14  chance of misunderstandings as there already has been within

15  the last couple of months obviously.

16      All right, do we have a current status report?

17          MR. BURCH:  I think there's a deadline on Monday.  I

18  was wondering whether it makes sense to modify that in light of

19  essentially what the Court has had in recent filings.

20          THE COURT:  Yes, I think it does. So I'll excuse the

21  parties from the current, the Joint Status Report filing

22  requirement.  I'll ask for a Joint Status Report on October

23  15th.  Why don't we say October 17th that will either -- and

24  then provide specific information as to the status of these

25  three documents.  Anything further Mr. Hardin?

1          MR. HARDIN:  Nothing from me, Your Honor.

2          THE COURT:  And Mr. Burch?

3          MR. BURCH:  No, Your Honor.

4          THE COURT:  All right, thanks gentlemen.  Good day.

5          MR. HARDIN:  Thank you.

6          MR. BURCH:  Thank you.

7          (Telephone conference adjourned at 3:15 p.m.)

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Crystal M. Pilgrim, Official Court Reporter, certify that the foregoing is a true and accurate transcript, to the best of my ability, of the proceedings remotely reported in the above-entitled matter.

**Please Note:** This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.

_____        _____
/s/ Crystal M. Pilgrim, RPR, FCRR        Date: October 20, 2020