UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ENERGY POLICY ADVOCATES    )
                           )
    Plaintiff,              )
                           )
    v.                      )   Civil Action No. 19-3307 (TNM)
                           )
U.S. DEPARTMENT OF STATE,  )
                           )
    Defendant.              )
                           )

### DECLARATION OF SUSAN C. WEETMAN

Pursuant to 28 U.S.C. § 1746, I, Susan C. Weetman, declare and state as follows:

1. I am the Deputy Director of the Office of Information Programs and Services ("IPS") of the United States Department of State (the "Department" or "State"), a position in which I have served since August 4, 2019. I am the Department official immediately responsible to responding to requests for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; the Privacy Act of 1974, 5 U.S.C. § 552a; and other applicable records access provisions. Prior to serving in this capacity, I served as the Chief of the Programs and Policies Division of IPS, beginning on May 15, 2016, and prior to that, I was the Branch Chief for Litigation and Appeals within the Programs and Policies Division of IPS, beginning on March 10, 2013.

2. The core responsibilities of IPS include: (1) responding to records access requests made by the public (including under the FOIA, the Privacy Act, and the mandatory declassification review requirements of the Executive Order governing classified national security information), by Members of Congress, by other government agencies, and those made pursuant to judicial process such as subpoenas, court orders, and discovery requests; (2) records management; (3)

- 1 -

national security classification management and declassification review; (4) corporate records archives management; (5) research; (6) operation and management of the Department's library; and (7) technology applications that support these activities.

3. I make the following statements based upon my personal knowledge, which in turn is based upon information furnished to me in the course of my official duties. I am familiar with the efforts of Department personnel to process the FOIA request that is the subject of this litigation, and I am in charge of coordinating the agency's search and recovery efforts with respect to that request.

4. This declaration explains the Department's administrative processing of the FOIA request at issue in this litigation and the FOIA exemptions applied to the documents identified by the Plaintiff to be challenged. The *Vaughn* Index that accompanies this Declaration (Ex. 1) includes, for all the contested withholdings that remain after the parties' recent discussions, a description of the documents and explanation for the contested withholdings.

5. The *Vaughn* Index addresses a total of three documents with contested withholdings. The Department invoked the deliberative process privilege to protect the contested withholdings under Exemption 5, and asserted the attorney-client privilege over a subset of the contested withholdings. In a single document, the Department also withheld individual government officials' cell phone numbers under Exemption 6.[1] All the documents with contested withholdings were released in part after a line-by-line review. I have reviewed the information withheld pursuant to these exemptions to ensure that all reasonably segregable information in the

---

[1] Plaintiff does not challenge the search conducted. *See* ECF No. 45. As to the applied exemptions, though Plaintiff initially challenged the Department's Exemption 5 and Exemption 6 withholdings, Plaintiff no longer challenges the Department's withholdings under Exemption 6, 5 U.S.C. § 552(b)(6), with respect to the withheld cellular phone numbers.

documents was released in accordance with the requirements of FOIA. In addition to this Declaration and attached *Vaughn* Index, Ex. 1, the released portions of the documents themselves provide additional information and context concerning the Department's redactions.

### ADMINISTRATIVE PROCESSING OF PLAINTIFFS' REQUESTS

6. In a letter dated June 7, 2019 (Ex. 2), Energy Policy Advocates ("Plaintiff" or "EPA") submitted a FOIA request, F-2019-06846, which included:

   1) all Circular 175 requests,
   2) Memorandum of Law re Circular 175, Subject: Request for authority to sign and accept the Paris Agreement
   3) any cover memo(s) transmitting Memorandum of Law re Circular 175
   4) Request for authority to sign and accept the Paris Agreement
   5) a document titled C-175 Procedure.docx (likely author is Susan Biniaz)
   6) a document titled Points on Joining Paris Agreement - One Pager (there is a document by that title that State circulated, possibly to "surrogates" and/or "validators" (we request only the final version; its likely author is Susan Biniaz)
   7) any emails a) transmitting either of the above described documents titled i) the Circular 175 for Paris climate agreement, and/or ii) Points on Joining Paris Agreement - One Pager, that b) were sent to any party internal or external, dated April 14, 2016 through September 14, 2016, inclusive, by i) Todd Stern, ii) Michael J, Mattler, iii) Susan Biniaz, iv) Clare Sierawski, v) Franz Hochstrasser, vi) Karen Johnson (Office of Oceans and International Environmental and Scientific Affairs), vii) Selene Ko, and/or viii) Brian J Egan. We also request all responses to any such transmittal, meaning, we request the entire thread of any email threads containing any such transmittal.

7. On November 3, 2019, EPA filed the instant litigation (Civ. A.19-3307 (TNM)) concerning its June 7, 2019, FOIA request.

8. Following Plaintiff's initiation of the litigation, the Department and EPA agreed to narrow the scope of the request for "all Circular 175 requests" to only the Circular 175 requests prepared during the Obama Administration.

9. Between February 21, 2020, and October 7, 2022, the Department produced 332 documents. Among those productions were several documents related to a memorandum to the

Secretary of State to seek authorization to join the Paris Climate Agreement.[2] The process of requesting this authority is referred to informally as the "Circular 175 procedure," a reference to a 1955 State Department "circular" that initially established the process.

10. In February 2022, in the midst of production, the Department and EPA agreed to further narrow the terms of the request to expedite processing of records, focusing on documents related directly to the Paris Climate Agreement.

11. Following the last production which occurred on October 7, 2022, the Parties agreed on an initial list of disputed issues in December 2022, and those issues were further refined between the Parties in February 2023.

12. By letter dated February 24, 2023, the Department released supplemental material in two documents that had been previously withheld in part.

## BACKGROUND

*The Action Memo Process*

13. Many formal decisions within the Department of State are made through the approval of specialized memorandums called "action memos," which convey the recommendations of relevant bureaus within the Department to the decision maker for his or her decision. Generally, the bureau and/or office with primary responsibility for a policy area is responsible for drafting an action memo concerning that subject and organizing other relevant bureaus or offices to provide "clearance" on the recommendations made for possible action before they are submitted to the Department principal responsible for the decision.

---

[2] The Paris Climate Agreement is a multilateral climate change agreement that was adopted by the Conference of the Parties to the UN Framework Convention on Climate Change on December 12, 2015, and that entered into force on November 4, 2016.

14. "Clearing" an action memo indicates that the reviewing official concurs with the package of information being forwarded to the decision maker. *See* 2 FAM 1211, *et seq.* Clearances are generally required to be obtained from all offices with an "equity" in the subject under review before the action memo is complete and can be submitted to the relevant decision maker. This ensures that the decision maker can review the action memo and trust that it embodies all the relevant advice and expertise needed to make a decision.

15. An action memo may offer more than one possible action for the principal's decision and may describe the risks and benefits of possible approaches. In other words, the recommendation in an action memo may be more nuanced than presenting a specific proposal to which a principal will simply say "yes" or "no." In addition, if some of the offices approached for "clearance" have divergent recommendations, an alternative, or a "split" action memo may be created that presents multiple options.

16. Action memos usually include attachments that provide more detail on a particular topic or other relevant background information for the decision maker's review and reference before taking a final action on the subject.

17. In general, approval of an action proposed in an action memo does not signify adoption of all the reasoning or background discussion included in the action memo. Only the specific action explicitly approved by the principal becomes the Department's official decision. Other explanation, views, or advice present in an action memo or its attachments would not be treated within the Department as reflecting a decision that would serve as a precedent for future decision making, as it would represent the views of subordinate officials advising the recipient of the action memo, as opposed to the adopted views of the final decision maker.

### *Role of the Office of the Legal Adviser*

18. The Office of the Legal Adviser ("L") furnishes advice on all legal issues, domestic and international, arising in the course of the Department's work. L is organized to provide direct legal support to the Department of State's various bureaus, including both regional and geographic offices (those which focus on specific areas of the world) and functional offices (those that deal with specific subject matters such as economics and business, international environmental and scientific issues, or internal management).

19. The Office of Treaty Affairs ("L/T") advises the Department and other U.S. Government agencies on treaty law, providing legal guidance concerning the drafting, negotiation, conclusion, application, and interpretation of international agreements. L/T also provides advice on and oversees implementation of the Circular 175 procedure through which the Secretary of State or other officials with delegated authorities authorize the negotiation and conclusion of international agreements by the United States. It is not uncommon for L to provide legal advice to other components of the executive branch when legal questions arise that touch on interpretation of international law or foreign affairs matters. *See, e.g.*, 11 FAM 713.1, 713.2.

20. The Secretary of State has authority to approve the negotiation, conclusion, amendment, and termination of international agreements by the United States. The Secretary of State has also delegated authority to approve the negotiation, conclusion, amendment, and termination of international agreements to the Deputy Secretary of State and six Under Secretaries of State. All aspects of an agreement, including whether to accept its particular terms and whether to recommend to the President that Senate advice and consent should be sought, would be ultimately decided by one of the specified State Department officials with that delegated authority.

21. In order to seek approval to conclude an international agreement from the Secretary or his or her designee, the lead bureau for a particular topic area would prepare a specialized action memo with relevant attachments and would organize the clearance of that package by all other relevant offices and agencies. Under 11 FAM 724.3, among other things, a C-175 action memo is to:

- "indicate[] what arrangements have been made and/or are planned as to (1) congressional consultation and (2) opportunity for public comment";
- "indicate whether [the proposed agreement] embodies a commitment to furnish funds, goods, or services beyond . . . those authorized in an approved budget; and if so, the plans for consulting with the Office of Management and Budget";
- indicate whether it "embodies a commitment that could reasonably be expected to require . . . the issuance of a 'significant regulatory action'";
- state whether the agreement will "significantly affect the quality of the human environment" if the agreement "has a potential for adverse environmental impact"; and
- be accompanied by "the text of any agreement and related exchange of notes . . . or other document to be signed" and "a memorandum of law prepared in the Office of the Legal Adviser."

22. The memorandum of law that accompanies a C-175 action memo would generally cover any pertinent legal issues raised in connection with negotiation or conclusion of the agreement, which may include, among other things, analysis of how to interpret the specific terms of the agreement, analysis of other relevant international law that may bear upon the operation of the agreement, authority to implement various components of the agreement under U.S. law, or any legal risks raised by the agreement. The memo is shaped by the ongoing consultations that will generally have taken place between the relevant client bureaus and L during the negotiation and consideration of the agreement and reflects confidential communications from client bureaus in relation to the request for legal advice made to L, as relevant officials developed their recommendations for the Secretary or his or her designee. Such a memorandum of law is appended as an attachment to the action memo, as required by 11 FAM 724.3(h)(3), and not as a standalone memorandum to the decision maker; in other words, it is only prepared if and when a client bureau

desires to put forward an action memo making a policy recommendation to the relevant decision maker.

23. The legal memorandum is required to include a discussion of "the legal authorities underlying the type of agreement recommended." 11 FAM 723.4. However, the decision to recommend or to ultimately utilize a particular means of entering into an international agreement from a domestic perspective would be a holistic decision based not only on legal advice but on many policy considerations. 11 FAM 723.3 makes clear that for some agreements there will be more than one "constitutionally authorized" procedure and lists other criteria that may be considered in deciding which approach ultimately to take. Many of these are not strictly legal considerations, such as "the preferences of the Congress as to a particular type of agreement," "the degree of formality desired for an agreement," and "the need for prompt conclusion of an agreement." 11 FAM 723.3.

24. The action memo must be cleared with "the Office of the Legal Adviser, including the Assistant Legal Adviser for Treaty Affairs, the Office of the Assistant Secretary for Legislative Affairs, other appropriate bureaus, and any other agency (such as Defense, Commerce etc.) which has primary responsibility or a substantial interest in the subject matter." 11 FAM 724.3(a). Clearance of the action memo by all the sources ensures that the action memo includes the views of all relevant offices and agencies before being submitted to the decision maker. These areas of the Department and any other relevant components of the executive branch are engaged in a joint deliberative process to provide recommendations to the appropriate decision maker, culminating in a final decision on whether to join an agreement and through what process.

25. The FAM also provides a separate procedure for requesting a decision from the Secretary of State or his or her designee on whether an international agreement should be

concluded as an international agreement other than a treaty or to recommend that the President seek the Senate's advice and consent to enter into the agreement as a treaty. *See* 11 FAM 723.4.b. A request for a decision on this issue may be made separately before the overall C-175 action memo is submitted when bureaus with equities in the agreement have not resolved the question about what recommendation to provide to the Secretary or his or her designee as to the type of agreement to be used. Where such a separate memo is not sent to the decision maker, this does not signify that the Department has come to a final decision on any aspect of an agreement before following the C-175 process. Only the Secretary or his or her designee would have the authority to make the determination to proceed with concluding an agreement as a treaty or an international agreement other than a treaty. The memorandum of law at issue in this case was written pursuant to an overall request to sign and accept the proposed agreement, as described in 11 FAM 724.3, and not to support a dedicated request for a decision on the issue of legal form, as described in 11 FAM 723.4(b).

## FOIA EXEMPTIONS CLAIMED

*FOIA Exemption 5 – Privileged Information*

26. Exemption 5, 5 U.S.C. § 552(b)(5), protects inter or intra-agency communications and materials that are normally considered privileged in the civil discovery context, including information that is protected by the deliberative process and attorney-client privileges.

*Deliberative Process Privilege*

27. As detailed in the attached *Vaughn* Index, Ex. 1, the Department has asserted the deliberative process privilege over all the contested Exemption 5 withholdings that remain in dispute between the parties.

28. The deliberative process privilege protects documents that reflect advisory opinions, recommendations, and deliberations that are part of the internal agency process by which the government makes decisions or formulates policies. The privilege is designed to protect the integrity of the internal agency decision-making process including candid discussions between Federal Government employees and to prevent public confusion due to premature disclosure of decisions before the government has formulated a final opinion.

29. For the deliberative process privilege to apply, the information withheld must be both predecisional and deliberative. Information is predecisional if (1) it reflects the consideration process prior to the decision in question being made and if (2) it is prepared to assist decisionmakers in reaching that decision. Information is deliberative if it is part of the give-and-take by which the government makes its decision. Recommendations, draft documents, proposals, suggestions, and other subjective documents reflecting the opinion of the writers, rather than the policy of the agency, are the type of information that are protected as deliberative.

30. The Department's deliberative process privilege withholdings fall into two categories, as summarized in the paragraphs below. More detailed explanations of the Department's invocation of the deliberative process privilege for each of the contested withholdings is supplied within the accompanying *Vaughn* Index, Ex. 1.

31. *First*, the Department withheld portions of an action memorandum ("action memo") and an attachment to the action memo, *see Vaughn* Doc. Nos. 1-2. The action memo requests authority to sign and accept the Paris Climate Agreement, which was submitted to the Secretary of State by the Office of the Special Envoy for Climate Change ("SECC"), with input from across the Department and the broader executive branch, including the State Department's Office of the Legal Adviser ("L"). The attachment to the action memo is a "Background Information" sheet


meant to accompany the action memo that describes subordinate officials' views on policy and legal questions raised concerning the Paris Climate Agreement and its potential acceptance by the United States.

32. The action memo and its attachment contain predecisional internal deliberations among officials from the Department and other executive branch components regarding policy and legal questions about the purpose, content, and form of the Paris Climate Agreement and its potential acceptance.

33. The Department released portions of the action memo and its attachment that are purely factual or that otherwise describe a final decision reached. The remaining withholdings protect substantive communications to the Secretary of State in which executive branch officials provide recommendations, including policy implications and legal advice and analysis. The resulting action memo and its attachment are a central component of the deliberative process used within the State Department leading up to a final decision by the Secretary of State concerning whether and how to join the Paris Climate Agreement on behalf of the United States.

34. The information withheld pursuant to Exemption 5 is predecisional because the documents were prepared prior to the final decision of the Secretary of State to sign the action memo and prepared by individuals who did not have final decision-making authority. These documents were prepared to support the Secretary's decision relating to one particular agreement, *i.e.*, the Paris Climate Agreement. The advice contained within the documents relates specifically to the recommended action related to the Paris Climate Agreement, based on a consideration of the substance of that agreement.

35. Disclosure of the policy and legal advice provided by subordinate members of the Department to the Secretary of State before his decision to enter into an international agreement

would foreseeably harm the Department's deliberative process by creating a substantial chilling effect on internal deliberations concerning future agreements (and the explanation of those deliberations for the Secretary's consideration), particularly because these internal deliberations would become available to officials of foreign governments with which the United States is negotiating international agreements. Disclosure would interfere with the ability of the Secretary to receive candid, thorough advice on the possible policy and legal risks of potential decisions, harming the quality of future decision-making. If the Secretary and officials throughout the Department fear that seeking policy and legal advice about an aspect of a draft agreement will subject that advice and their confidential communications surrounding that advice to public disclosure, they may abstain from seeking important advice or sharing key facts with Department officials and attorneys and in turn, the Secretary will not receive a full picture of the policy and legal considerations or risks at issue before entering future agreements.

36. In addition, the disclosure of the advice and recommendations made to the Secretary in the action memo and its attachment could cause public confusion about the ultimate reasoning of the Secretary for his final decision. The danger of public confusion is particularly high here, as policy and legal analysis of the history of the agreement, U.S. and other nations' goals and strategies for the drafting agreement, the meaning of particular provisions, and what risks exist, could be improperly interpreted as positions of the U.S. Government, not only by the American public, but by representatives of other nations.

37. *Second*, the Department withheld the substantive portions of a set of draft talking points regarding the domestic legal process for the United States to enter into an international agreement, *see Vaughn* Doc. No. 3. These draft talking points were prepared as executive branch

officials were formulating strategies for bilateral and foreign engagement pertaining to prominent policy events.

38. These draft proposed talking points were prepared by a State Department attorney who is a leading subject matter expert on the legal procedures for joining international agreements for the potential use of National Security Council officials. The talking points included suggestions on how to frame certain issues and may not have been used verbatim or at all. Typically, documents that contain talking points also contain hypothetical issues a foreign partner might raise and proposed responses. Such anticipated issues reflect the drafting official's analysis and judgement, and the proposed responses may be used for reference on a contingency basis if the issue or a similar one arises.

39. The information withheld in the draft talking points pursuant to Exemption 5 is predecisional because the document was prepared and exchanged prior to the occurrence of a bilateral or multilateral engagement that may never have occurred. The ultimate decision as to that engagement and the content of the potential discussions were up to the National Security Council officials, not the State Department attorney providing input on arguments to make. Deliberations about the content and execution of foreign diplomatic engagements often take place in the context of broader discussions of accompanying policy strategies and the underlying policy actions at issue. Moreover, the draft talking points were generated before the Secretary reached a final decision on the legal form of the United States entry into the Paris Climate Agreement. Therefore, the policy matters discussed in the draft document do not reflect final Department policy.

40. Disclosure of the views and advice offered during internal discussions pertaining to an agency decision and/or policy formulation, and related international engagement strategies,

would chill the flow of internal recommendations, candid assessments, and other necessary exchanges, in which Department officials are routinely involved. It would therefore hamper the ability of responsible officials to formulate and carry out executive branch programs. Release of these preliminary comments, opinions, ideas, and recommendations could also cause public confusion as to what constitutes a final agency decision. The withheld information is, accordingly, exempt from release under Exemption 5 pursuant to the deliberative process privilege.

*Attorney Client Privilege*

41. As detailed in the attached *Vaughn* Index, Ex. 1, each of the documents with contested Exemption 5 withholdings include information that is protected not just by the deliberative process privilege, but also by the attorney-client privilege.[3]

42. The attorney-client privilege protects confidential communications between attorneys and clients for the purpose of seeking or providing legal advice.

43. The information withheld as attorney-client privileged among the contested withholdings contain confidential communications between Department attorneys and their clients regarding (1) legal issues attendant to the potential U.S. acceptance of the Paris Climate Agreement (*Vaughn* Doc. Nos. 1-2); and (2) the legal issues involved in the domestic process for the U.S. to enter into an international agreement (*Vaughn* Doc. No. 3). The specific legal guidance is confidential within the executive branch and the State Department has not waived the privileged nature of the documents.

---

[3] As noted above, all of the Department's attorney-client privilege withholdings overlap with deliberative process privilege withholdings (*i.e.*, the Department also invoked the deliberative process privilege over all of the withholdings to which the attorney-client privilege applies). Therefore, if the Court affirms all the Department's deliberative process privilege withholdings, it need not address the Department's attorney-client privilege withholdings in order to affirm the Department's approach to the contested withholdings.

44. These documents were prepared to support decision-making and international diplomatic efforts relating only to the Paris Climate Agreement. The advice contained within the documents relates specifically to recommended actions and procedures related to the Paris Climate Agreement, based on a consideration of the substance of that agreement. As such, the legal analysis does not operate or function as advice in connection with other agency actions, and any future C-175 memos relating to other matters would be accompanied by particularized legal analyses fashioned to provide advice related to the pertinent subject matter.

45. The withheld documents reflect the two-way exchanges that occur between clients and their attorneys when seeking and providing legal advice, and include facts divulged to one or more attorneys for the purpose of obtaining legal advice as well as opinions given by the attorneys based upon and reflecting those facts.

46. The disclosure of confidential communications between State Department attorneys and their clients would have a chilling effect on attorney consultations within the executive branch and undermine the future ability of those officials to seek legal advice to guide their policy decisions based upon a full understanding of the relevant facts and law. The fact that receiving legal advice as part of a C-175 action memo is deemed by Department policy to be essential to appropriately entering into an international agreement should only underscore the importance of upholding the confidentiality of these documents.

## CONCLUSION

47. In summary, the withholdings identified by the Plaintiff to be challenged are properly withheld under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of March 2023, in Charleston, South Carolina.

*Susan C. Weetman*
SUSAN C. WEETMAN
Deputy Director
Office of Information Programs and Services
U.S. Department of State