# Exhibit
# 2

*F- 2019-06836*

# REQUEST UNDER THE FREEDOM OF INFORMATION ACT

June 7, 2019

Office of Information Programs and Services
A/GIS/IPS/RL
U. S. Department of State
Washington, D. C. 20522-8100

## VIA FACSIMILE: (202) 261-8579

RE: ***EXPEDITED*** **FOIA Request – Circular 175 requests** and accompanying memoranda of law pertaining to December 2015 Paris climate agreement

To State Freedom of Information Office,

On behalf of the public policy group Energy Policy Advocates (EPA), and pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, please provide us, within twenty working days,[1] copies of the following described records. EPA is a non-profit public policy institute organized under section 501(c)3 of the tax code, with research and publication functions as part of its transparency initiative seeking to learn and educate the public on environmental and energy policy and how policymakers use public resources. These core functions include broad dissemination of public information obtained under open records and freedom of information laws by serving as a

---

[1] See *Citizens for Responsible Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 186 (D.C. Cir. 2013), and discussion, *infra*.

1

resource to the media to disseminate our findings[2], on its website and also through a website dedicated to these issues, ClimateLitigationWatch.com, operated by an organization EPA partners with on these issues.

### *Please provide us on an expedited basis the following:*

1) all Circular 175 requests,[3]

2) Memorandum of Law re Circular 175, Subject: Request for authority to sign and accept the Paris Agreement

3) any cover memo(s) transmitting Memorandum of Law re Circular 175

4) Request for authority to sign and accept the Paris Agreement

5) a document titled C-175 Procedure.docx (likely author is Susan Biniaz)

6) a document titled Points on Joining Paris Agreement - One Pager (there is a document by that title that State circulated, possibly to "surrogates" and/or "validators" (we request only the final version; its likely author is Susan Biniaz)

---

[2] See, e.g., Michael Graham, "Bloomberg battalion working out of AG's office", Boston Herald, June 4, 2019, https://www.bostonherald.com/2019/06/04/bloomberg-battalion-working-out-of-ags-office/; Rick Sobey, "Attorney General sued by group seeking records involving Michael Bloomberg, ExxonMobil", Boston Herald, June 4, 2019, https://www.bostonherald.com/2019/06/03/attorney-general-maura-healey-sued-by-group-seeking-records-involving-michael-bloomberg-exxonmobil/; Michael Graham, "Lawsuit Targets Secret Documents Between MA Attorney General and Environmental Activists", InsideSources.com, June 3, 2019, https://www.insidesources.com/lawsuit-targets-secret-documents-between-ma-attorney-general-and-environmental-activists/; Chris White, "Anti-Trump AG sued for using Bloomberg-funded attorneys to promote a climate crusade", Daily Caller, June 5, 2019, https://dailycaller.com/2019/06/05/anti-trump-attorneys-general/.

[3] "There are two kinds of Circular 175 requests. One calls for the approval of full powers to sign treaties that the President will send to the Senate for advice and consent to ratification. ...[the other is] an action memorandum from a bureau or office in the State Department to a Department official at the Assistant Secretary level or above, requesting authority to negotiate, conclude, amend, extend, or terminate an international agreement." Circular 175 Procedure https://www.state.gov/s/l/treaty/c175/. See also https://www.state.gov/e/oes/rls/rpts/175/1319.htm.

2

7) any emails a) transmitting either of the above described documents titled i) the Circular 175 for Paris climate agreement, and/or ii) Points on Joining Paris Agreement - One Pager, that b) were sent to any party internal or external, dated April 14, 2016 through September 14, 2016, inclusive, by i) Todd Stern, ii) Michael J, Mattler, iii) Susan Biniaz, iv) Clare Sierawski, v) Franz Hochstrasser, vi) Karen Johnson (Office of Oceans and International Environmental and Scientific Affairs), vii) Selene Ko, and/or viii) Brian J Egan. We also request all responses to any such transmittal, meaning, we request the entire thread of any email threads containing any such transmittal.

As to the non-email records requested, we are confident that State maintains Circular 175 records together in a discrete location and the search should not require appreciable time or other resources.

These records are of immense public interest. The Obama White House declared the December 2015 Paris agreement the "most ambitious climate change agreement in history",[4] therefore more ambitious than two predecessor climate agreement acknowledged by all parties to be treaties. Most parties have ratified Paris as a treaty under their own systems but, regardless, for U.S. purposes Paris has every appearance of being a treaty under Circular 175, and has been ratified as a treaty by legislatures around the world — if "deemed" into existence by then-heads of government of a small number of outlier countries, including the United States and North Korea.

---

[4] The White House, Office of the Press Secretary, "U.S. Leadership and the Historic Paris Agreement to Combat Climate Change," December 12, 2015, https:// obamawhitehouse.archives.gov/the-press-office/2015/12/12/us-leadership-and-historic-paris-agreement-combat-climate-change.

3

Records responsive to this request will reveal the mechanics of orchestrating purported adoption of this most prescriptive and expressly perpetual agreement this way; each Circular 175 Memorandum of Law offers discussion and justification of the designation given to the proposed agreement (treaty vs. executive agreement), which legal authority State claims for negotiating and/or concluding the proposed agreement. These include, presumably, an analysis of the constitutional powers relied upon as well as any pertinent legislation, and analysis of the issues surrounding the agreement's implementation as a matter of domestic law (e.g., whether the agreement is self-executing, whether domestic implementing legislation or regulations will be necessary before or after the agreement's execution).[5] This is critical information, for reasons stated.

According to the State Department Foreign Affairs Manual (FAM) 11 FAM 751, "Carrying out and providing advice and assistance respecting the provisions of [relevant FAM] chapter is the responsibility of the Assistant Legal Adviser for Treaty Affairs (L/ T)". *As such, State can promptly locate records responsive to this request there.*

We agree to pay up to $250.00 for responsive records in the event State denies our fee waiver request detailed, *infra.*

## EXPEDITED CONSIDERATION

State Department procedures[6] note, in pertinent part:

4. The information is urgently needed by an individual primarily engaged in publicizing information in order to inform the public concerning actual or alleged government activity. News media requesters would normally qualify; however,

[5] See generally https://www.state.gov/s/l/treaty/c175/

[6] https://foia.state.gov/Request/Handling.aspx

4

other persons should demonstrate that their primary activity involves publishing or otherwise disseminating information to the public, not just a particular segment or group.

a. Urgently needed means that the information has a particular value that will be lost if not distributed quickly. Ordinarily this means a breaking news story of general public interest....

b. Actual or alleged Federal Government activity. The information concerns some actions taken, contemplated, or alleged by or about the government of the United States, or one of its components or agencies, including the Congress.

This request satisfies those considerations for the following reasons.

EPA is a media entity for FOIA's purposes. Further, time is of the essence.

President Trump has announced that he will withdraw from Paris on or before November 8, 2020. History and media behavior generally suggest that this will, therefore, be an issue of intense public debate. That debate must be an informed one. These records will inform the debate. Any debate over that decision that is denied access to this information will be thereby be improperly denied key information directly relevant to the President's decision: it is our understanding on information and belief that the State Department advisory memo reveals materially, indeed severely misleading advice, both by commission and (particularly) by omission of the considerations that would be found in records responsive to this request. But for release of this information now it appears that the public, and even the President, will be asked to make a decision about staying in or withdrawing from the Paris climate treaty without the most relevant factors being anywhere part of the discussion: was the decision on legal form a properly informed one?

5

In the event State denies our request for expedited processing, we intend to promptly seek to protect our rights to obtain this record(s) in the most timely fashion consistent with the FOIA. Additionally, we remain mindful of the D.C. Circuit's ruling in *Citizens for Responsible Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 186 (D.C. Cir. 2013) and so also note to State our intention to promptly protect our rights in any event the Department fails to provide the required, timely response.

We have properly narrowed the scope of this request for prompt satisfaction.

## Relevant Background to this Request and the Public Interest

"The Circular 175 procedure refers to regulations developed by the State Department to ensure the proper exercise of the treaty-making power. Its principal objective is to make sure that the making of treaties and other international agreements for the United States is carried out within constitutional and other appropriate limits, and with appropriate involvement by the State Department."[7] State Department Foreign Affairs Manual 11 FAM 721, "is a codification of the substance of Department Circular No. 175, December 13, 1955, as amended, on the negotiation and conclusion of treaties and other international agreements."[8] It states that, "The C-175 procedure facilitates the application of orderly and uniform measures to the negotiation, conclusion, reporting, publication, and registration of U.S. treaties and international agreements, and facilitates the maintenance of complete and accurate records on such agreements". Id.

---

[7] See generally https://www.state.gov/s/l/treaty/c175/

[8] https://fam.state.gov/searchapps/viewer?
format=html&query=circular%20175&links=CIRCULAR,175&url=/FAM/11FAM/
11FAM0720.html#M721

6

President Obama purported to commit the United States to the December 2015 Paris climate agreement as an agreement among executives requiring no legislative approval. Regardless most countries somehow managed to involve their own elected parliamentary bodies in approving the agreement, and apparently as a treaty if their submissions to the United Nations depository offer any guide.[9] These include France, those whose diplomats made clear an overriding need to avoid Paris "going to Congress", because "we know the politics in the U.S. Whether we like it or not, if it comes to the Congress, they will refuse"[10] This confession helps inform the Obama White House's telling admission that the Paris treaty was "the most ambitious in history".

All of these factors cry out for public review and assessment of State's determination as to why it decided a nation, whose Constitution imposes a rare two-thirds supermajority requirement for treaty agreements, handled its entry into this admittedly unpopular agreement as matter purely between executives, requiring no legislative involvement (widespread legislative involvement elsewhere in the world, in countries with standards for treaties far less strict than the U.S. Constitution's, notwithstanding).

The public should understand how the United States recently revolutionized its treaty process such that the Senate's expressly shared role in the treaty power now exists solely at the pleasure of the executive if the treaty is unpopular. The public deserve to

---

[9] UNFCCC—Paris Agreement, Status of Ratification, http://unfccc.int/paris_agreement/items/9444.php.

[10] "Climate Deal Must Avoid US Congress Approval, French Minister Says," *The Guardian*, June 1, 2015, http://www.theguardian.com/world/2015/jun/01/un-climate-talks-deal-us-congress. Parties with similar systems if generally even less stringent requirements for legislative approval of international commitments which have included parliamentary body approval include Germany, Japan, Australia, Canada, Mexico, even China's Peoples National Congress and the European Parliament and, of course, France.

7

C06776457

learn the details of how it came to be that that this power-sharing is now viewed as having been created only for those occasions when the executive is confident the Senate will go along with his desires; when that is not assured, he may merely deem a treaty to be "not a treaty". This is indeed revolutionary — that the Constitution's rare imposition of a supermajority requirement is actually code to take the Senate's role less, not more seriously than its majority-vote roles in, say, approving Supreme Court justices, found alongside its now passé role in the treaty process also found in Art. II, Sec. 2.

The requested public records manifesting this revolution must be released.

Both for the public to understand the upcoming presidential determination on the Paris climate agreement, and to understand how State performed its advisory role — both regarding what it stated and what it may have left unstated — is of great public importance.

The public currently has no source of information on the subject matter at the center of this request. State's response to this request will provide an important window into how the State Department carried and is carrying out its obligation to properly consider and accurately advise the executive branch on international obligations. This will provide information on what State did and did not inform the executive of in its assessment of the Paris climate agreement.

Because there is no such information is currently available to the public, any increase in public understanding of this issue is a significant contribution to this highly visible and politically important issue as regards the operation and function of government.

All of the above notwithstanding, FOIA requires no motive, or demonstration of wrongdoing, and the public interest prong, for fee waiver, is the only aspect to which these factors are relevant; we address the public interest in the issue in detail, *infra*, and respectfully remind State that as EPA is a representative of the news media entitled to expedited processing, it can be charged, at most, the costs of copying these records (for electronic records, those costs should be *de minimis*).

### State Must Err on the Side of Disclosure

It is well-settled that Congress, through FOIA, "sought 'to open agency action to the light of public scrutiny.'" *DOJ v. Reporters Comm. for Freedom of Press*, 498 U.S. 749, 772 (1989) (*quoting Dep't of Air Force v. Rose*, 425 U.S. 353, 372 (1976)). The legislative history is replete with reference to the, "'general philosophy of full agency disclosure'" that animates the statute. *Rose*, 425 U.S. at 360 (*quoting* S.Rep. No. 813, 89th Cong., 2nd Sess., 3 (1965)). Accordingly, when an agency withholds requested documents, the burden of proof is placed squarely on the agency, with all doubts resolved in favor of the requester. *See, e.g., Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 352 (1979). This burden applies across scenarios and regardless of whether the agency is claiming an exemption under FOIA in whole or in part. *See, e.g., Tax Analysts*, 492 U.S. 136, 142 n. 3 (1989); *Consumer Fed'n of America v. Dep't of Agriculture*, 455 F.3d 283, 287 (D.C. Cir. 2006); *Burka*, 87 F.3d 508, 515 (D.C. Cir. 1996).

These disclosure obligations are to be accorded added weight in light of an earlier, if extant Presidential directive to executive agencies to comply with FOIA to the fullest extent of the law. *Presidential Memorandum For Heads of Executive Departments and*

9

C06776457

*Agencies*, 75 F.R. § 4683, 4683 (Jan. 21, 2009). As the President emphasized, "a democracy requires accountability, and accountability requires transparency," and "the Freedom of Information Act... is the most prominent expression of a profound national commitment to ensuring open Government." Accordingly, the President has directed that FOIA "be administered with a clear presumption: In the face of doubt, openness prevails" and that a "presumption of disclosure should be applied to all decisions involving FOIA."

### The State Department Owes EPA a Reasonable Search

FOIA requires an agency to make a reasonable search of records, judged by the specific facts surrounding each request. *See, e.g., Itrurralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994). In this situation, there should be no difficulty in finding these documents. While the exact location the documents are held is unknown to requesters, the Department doubtless knows the exact email addresses of its own employees and is in a position to ascertain whether its employees have corresponded with any of the outside individuals named above, using officials accounts, and must ask as a result of this request whether they corresponded on relevant topics on any unofficial accounts.

It is well-settled that Congress, through FOIA, "sought 'to open agency action to the light of public scrutiny.'" *DOJ v. Reporters Comm. for Freedom of Press*, 498 U.S. 749, 772 (1989) (*quoting Dep't of Air Force v. Rose*, 425 U.S. 353, 372 (1976)). The legislative history is replete with reference to the "'general philosophy of full agency disclosure'" that animates the statute. *Rose*, 425 U.S. at 360 (*quoting* S.Rep. No. 813, 89th Cong., 2nd Sess., 3 (1965)). The act is designed to "pierce the veil of administrative

10

secrecy and to open agency action to the light of scrutiny." *Department of the Air Force v. Rose*, 425 U.S. 352 (1976). It is a transparency-forcing law, consistent with "the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Id.*

Withholding and Redaction

Please identify and inform us of all responsive or potentially responsive records within the statutorily prescribed time, and the basis of any claimed exemptions or privilege and to which specific responsive or potentially responsive record(s) such objection applies. Pursuant to high-profile and repeated promises and instructions from a recent-past President and Attorney General we request the State Department err on the side of disclosure and not delay production of this information of great public interest through lengthy review processes over which withholdings they may be able to justify.

We request you exercisé that discretion and release any records, and any information potentially exempt under a discretionary exclusion, consistent with statements by those recent-past President and Attorney General, *inter alia*, that **"The old rules said that if there was a defensible argument for not disclosing something to the American people, then it should not be disclosed. That era is now over, starting today" (President Barack Obama, January 21, 2009), and "Under the Attorney General's Guidelines, agencies are encouraged to make discretionary releases. Thus, even if an exemption would apply to a record, discretionary disclosures are encouraged."** (Department of Justice, Office of Information Policy, OIP Guidance, "Creating a 'New Era of Open Government'").

11

Nonetheless, if your office takes the position that any portion of the requested records is exempt from disclosure, please inform us of the basis of any partial denials or redactions, and provide the rest of the record, all reasonably segregable, non-exempt information, withholding only that information that is properly exempt under one of FOIA's nine exemptions. *See* 5 U.S.C. §552(b). We remind the State Department that it cannot withhold entire documents rather than producing their "factual content" and redacting any information that is legally withheld under FOIA exemptions. As the D.C. Circuit Court of Appeals noted, the agency must "describe the factual content of the documents and disclose it or provide an adequate justification for concluding that it is not segregable from the exempt portions of the documents." *King v. Department of Justice*, 830 F.2d 210, at 254 n.28 (D.C. Cir. 1987).

If it is your position that a document contains non-exempt segments and that those nonexempt segments are so dispersed throughout the documents as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed through the document. *See Mead Data Central v. Department of the Air Force*, 455 F.2d 242, 261. Further, we request that you provide us with an index all such withheld documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972), with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA" pursuant to *Founding Church of Scientology v. Bell*, 603 F.2d 945, 959(D.C. Cir. 1979), and "describ[ing] each document or portion thereof withheld, and for each withholding it

12

must discuss the consequences of supplying the sought-after information." *King v. Department of Justice*, 830 F.2d at 223-24.

**Claims of non-segregability must be made with the same practical detail as required for claims of exemption in a Vaughn index.** If a record is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

**Satisfying this request contemplates providing copies of documents, in electronic format if you possess them as such; as the requested records are electronic mail, this should be all responsive records.**

Please provide responsive documents in complete form.

**Request for Fee Waiver**

This discussion is detailed as a result of agencies improperly using denial of fee waivers to impose an economic barrier to access, an improper means of delaying or otherwise denying access to public records[11]. **The following discussion is only relevant if the State Department questions our fee waiver; in the event the State Department agrees to our fee waiver it may ignore this discussion.**

**Disclosure would substantially contribute to the public at large's understanding of governmental operations or activities, on a matter of demonstrable public interest.**

---

[11] *See* February 21, 2012 letter from public interest or transparency groups to four federal agencies requesting records regarding a newly developed pattern of fee waiver denials and imposition of "exorbitant fees" under FOIA as a barrier to access, available at http://images.politico.com/global/2012/03/aclueffleewvrfoialtr.pdf; *see also National Security Counselors v. CIA* (CV: 12-cv-00284(BAH), filed D.D.C Feb. 22, 2012); *see also* "Groups Protest CIA's Covert Attack on Public Access," OpentheGovernment.org, February 23, 2012, http://www.openthegovernment.org/node/3372. *See also* William D. Cohan, Stonewalled by the S.E.C., May 13, 2010, http://opinionator.blogs.nytimes.com/2010/05/13/stonewalled-by-the-s-e-c/?_r=0.

C06776457

EPA's principal request for waiver or reduction of all costs is pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge... if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester").

EPA does not seek these records for a commercial purpose. Requester is organized and recognized by the Internal Revenue Service as 501(c)3 educational organization. As such, requester also has no commercial interest possible in these records. If no commercial interest exists, an assessment of that non-existent interest is not required in any balancing test with the public's interest.

As a non-commercial requester, EPA is entitled to liberal construction of the fee waiver standards. 5 U.S.C.S. § 552(a)(4)(A)(iii), *Perkins v. U.S. Department of Veterans Affairs*, 754 F. Supp. 2d 1 (D.D.C. Nov. 30, 2010).

The public interest fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F. 2d 1284, 2184 (9th Cir. 1987). The Requester need not demonstrate that the records would contain any particular evidence, such as of misconduct. Instead, the question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government, period. *See Judicial Watch v. Rosotti*, 326 F. 3d 1309, 1314 (D.C. Cir 2003).

FOIA is aimed in large part at promoting active oversight roles of watchdog public advocacy groups. "The legislative history of the fee waiver provision reveals that

14

it was added to FOIA 'in an attempt to prevent government agencies from using high fees to discourage certain types of requesters, and requests,' in particular those from journalists, scholars and nonprofit public interest groups." *Better Government Ass'n v. State*, 780 F.2d 86, 88-89 (D.C. Cir. 1986) (fee waiver intended to benefit public interest watchdogs), citing to *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D.Mass. 1984); S. COMM. ON THE JUDICIARY, AMENDING the FOIA, S. REP. NO. 854, 93rd Cong., 2d Sess. 11-12 (1974)).[12]

"This is in keeping with the statute's purpose, which is 'to remove the roadblocks and technicalities which have been used by... agencies to deny waivers.'" *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Educ.*, 593 F. Supp. 261, 268 (D.D.C. 2009), citing to *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th. Cir. 1987) (quoting 132 Cong. Rec. S16496 (Oct. 15, 1986) (statement of Sen. Leahy).

Requester's ability — as well as many nonprofit organizations, educational institutions and news media that will benefit from disclosure — to utilize FOIA depends on their ability to obtain fee waivers. For this reason, "Congress explicitly recognized the

---

[12] This was grounded in the recognition that the two plaintiffs in that merged appeal were, like Requester, public interest non-profits that "rely heavily and frequently on FOIA and its fee waiver provision to conduct the investigations that are essential to the performance of certain of their primary institutional activities – publicizing governmental choices and highlighting possible abuses that otherwise might go undisputed and thus unchallenged. These investigations are the necessary prerequisites to the fundamental publicizing and mobilizing functions of these organizations. Access to information through FOIA is vital to their organizational missions." *Better Gov't v. State*. They therefore, like Requester, "routinely make FOIA requests that potentially would not be made absent a fee waiver provision", requiring the court to consider the "Congressional determination that such constraints should not impede the access to information for appellants such as these." *Id.*

15

importance and the difficulty of access to governmental documents for such typically under-funded organizations and individuals when it enacted the 'public benefit' test for FOIA fee waivers. This waiver provision was added to FOIA 'in an attempt to prevent government agencies from using high fees to discourage certain types of requesters and requests,' in a clear reference to requests from journalists, scholars and, most importantly for our purposes, nonprofit public interest groups. Congress made clear its intent that fees should not be utilized to discourage requests or to place obstacles in the way of such disclosure, forbidding the use of fees as '"toll gates" on the public access road to information.'" *Better Government Ass'n v. State*, 780 F.2d 86, 88-89 (D.C. Cir. 1986).

As the *Better Government* court also recognized, public interest groups employ FOIA for activities "essential to the performance of certain of their primary institutional activities -- publicizing governmental choices and highlighting possible abuses that otherwise might go undisputed and thus unchallenged. These investigations are the necessary prerequisites to the fundamental publicizing and mobilizing functions of these organizations. Access to information through FOIA is vital to their organizational missions." *Id.*

Congress enacted FOIA clearly intending that "fees should not be used for the purpose of discouraging requests for information or as obstacles to disclosure of requested information." *Ettlinger v. F.B.I.*, 596 F. Supp. 867, 872 (D. Mass. 1984), citing Conf. Comm. Rep., H.R. Rep. No. 1380, 93d Cong., 2d Sess. 8 (1974) at 8. Refusal of fees as a means of withholding records from a FOIA requester constitutes improper withholding. *Id.* at 874.

16

Therefore, "insofar as... [agency] guidelines and standards in question act to discourage FOIA requests and to impede access to information for precisely those groups Congress intended to aid by the fee waiver provision, they inflict a continuing hardship on the non-profit public interest groups who depend on FOIA to supply their lifeblood -- information." *Better Gov't v. State* (internal citations omitted). The courts therefore will not permit such application of FOIA requirements that "'chill' the ability and willingness of their organizations to engage in activity that is not only voluntary, but that Congress explicitly wished to encourage." *Id.* As such, agency implementing regulations may not facially or in practice interpret FOIA's fee waiver provision in a way creating a fee barrier for Requester.

Courts have noted FOIA's legislative history to find that a fee waiver request is likely to pass muster "if the information disclosed is new; supports public oversight of agency operations, including the quality of agency activities and the effects of agency policy or regulations on public health or safety; or, otherwise confirms or clarifies data on past or present operations of the government." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d at 1284-1286 (9th Cir. 1987).

This information request meets that description, for reasons both obvious and specified.

1) **The subject matter of the requested records specifically concerns identifiable operations or activities of the government.** The background provided, *supra*, leaves no doubt that potentially responsive records unquestionably reflect

17

"identifiable operations or activities of the government" with a connection that is direct and clear, not remote. We incorporate those statements here by reference.

The Department of Justice Freedom of Information Act Guide expressly concedes that this threshold is easily met. There can be no question that this is such a case.

2) **Requester intends to broadly disseminate responsive information.** As demonstrated herein requester has both the intent and the ability to convey any information obtained through this request to the public. As cited, *supra*, EPA regularly engages in work that is cited in newspapers and trade and political publications, representing a practice of broadly disseminating public information obtained under FOIA, which practice requester intends to continue in the instant matter.

3) **Disclosure is "likely to contribute" to an understanding of specific government operations or activities because the releasable material will be meaningfully informative in relation to the subject matter of the request.** Requester intends to broadly disseminate responsive information. The requested records have an informative value and are "likely to contribute to an understanding of Federal government operations or activities," for reasons reiterated in "1" by reference. An internet search for the decision to withdraw from Paris, as well as on the decision to proceed with this "most ambitious climate agreement in history" affirms this.

However, the Department of Justice's Freedom of Information Act Guide makes it clear that, in the DoJ's view, the "likely to contribute" determination hinges in substantial part on whether the requested documents provide information that is not already in the public domain. State has not published any of the requested records.

18

Thus, disclosure and dissemination of this information will facilitate meaningful public participation in the policy debate, therefore fulfilling the requirement that the documents requested be "meaningfully informative" and "likely to contribute" to an understanding of your agency's dealings on the above-described issue of critical importance, "the most ambitious climate agreement in history" which poses increased legal risk to the United States and its citizens as well as economic implications.

4) **The disclosure will contribute to the understanding of the public at large, as opposed to the understanding of the requester or a narrow segment of interested persons.** This is, simply put, not a niche issue but an issue of significant public, policymaker and media interest. Requester's practice and intent is to educate the public, lawmakers, and news media about the government's operations.

With a demonstrated interest and record in the relevant policy debates and expertise in the subject of energy- and environment-related regulatory policies, EPA unquestionably has the "specialized knowledge" and "ability and intention" to disseminate the information requested in the broad manner, and to do so in a manner that contributes to the understanding of the "public-at-large."

5) **The disclosure will contribute "significantly" to public understanding of government operations or activities.** *We repeat and incorporate here by reference the arguments above from the discussion of how disclosure is "likely to contribute" to an understanding of specific government operations or activities.*

Any increase in public understanding of this issue is a significant contribution to this increasingly important issue as regards the operation and function of government.

19

Because EPA has no commercial interests of any kind, disclosure can only result in serving the needs of the public interest.

**Conclusion**

We expect the State Department to release within the statutory period of time all segregable portions of responsive records, withholding only those containing properly exempt information, and to provide information that may be withheld under FOIA's discretionary provisions, and otherwise proceed with a bias toward disclosure, consistent with the law's clear intent, judicial precedent affirming this bias, and President Obama's directive to all federal agencies on January 26, 2009. Memo to the Heads of Exec. Offices and Agencies, Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 26, 2009)("The Freedom of Information Act should be administered with a clear presumption: in the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, or because of speculative or abstract fears.").

FOIA specifically requires the Department to immediately notify requesters with a particularized and substantive determination, and of its determination and its reasoning, as well as requesters' right to appeal; further, FOIA's unusual circumstances safety valve to extend time to make a determination, and its exceptional circumstances safety valve providing additional time for a diligent agency to complete its review of records, indicate that responsive documents must be collected, examined, and reviewed in order to constitute a determination. *See, CREW v. FEC*, 711 F.3d 180, 186 (D.C. Cir. 2013). *See also; Muttitt v. U.S. Central Command*, 813 F. Supp. 2d 221; 2011 U.S. Dist. LEXIS

20

110396 at *14 (D.D.C. Sept. 28, 2011) (addressing "the statutory requirement that [agencies] provide estimated dates of completion").

We request a rolling production of records, should it be necessary, such that the Department furnishes records to undersigned counsel's attention as soon as they are processed, again preferably electronically, not waiting for the entire population of potentially responsive records to be processed.

We inform the State Department of our intention to protect our appellate rights on this matter at the earliest date should the Department not comply with FOIA per, e.g., *CREW v. FEC*. If you have any questions please do not hesitate to contact undersigned.

Respectfully submitted,

Matthew D. Hardin

Executive Director

Energy Policy Advocates

21

# FAX COVER SHEET

| | |
|---|---|
| TO | State Department |
| COMPANY | |
| FAX NUMBER | 12022618579 |
| FROM | MatthewHardin |
| DATE | 2019-06-07 19:39:12 GMT |
| RE | FOIA Request |

## COVER MESSAGE

Please feel free to contact me via email at MatthewDHardin@gmail.com or phone at 804-240-6773 with any questions about this request.