**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ENERGY POLICY ADVOCATES**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF STATE**, <br><br> Defendant. | Case No. 1:19-cv-03307 (TNM) |

**MEMORANDUM OPINION**

Plaintiff Energy Policy Advocates sues the State Department under FOIA for documents related to the agency's handling of the 2016 Paris Climate Agreement.  State produced hundreds of records, but only three remain at issue.  These are an action memo seeking authority to join the Agreement, an attached background document, and a set of draft talking points State sent to the National Security Council about entering the Agreement.  State redacted information in all three documents under Exemption 5's deliberative process and attorney client privileges.  Plaintiff challenges these privilege claims on multiple grounds.  The Court will grant State summary judgment because it adequately demonstrates both privileges and satisfies its segregability burden.

**I.**

The State Department oversees international agreements and treaties.  The Secretary of State dictates the United States' entry into some of those agreements.  *See* Pl.'s Stmt. of Genuine Issues of Mat'l Fact (Pl.'s SMF) ¶ 5, ECF No. 50-4.  And State's policy requires written authorization from the Secretary before the United States enters any "significant international

agreements[.]"  *See* U.S. State Dep't, 11 Foreign Affairs Manual ("FAM") 724.1 (2006).[1]  To get authorization, State employees follow the "Circular 175" process, named for the document that initially established it.  11 FAM 721; Pl.'s SMF ¶ 9.  A key part of the process involves subordinates sending "action memos" with background information to the Secretary.  11 FAM 724.3; Pl.'s SMF ¶¶ 2, 3.  The Secretary then approves or disapproves of the memo's recommendations by signing the memo itself.  *See, e.g.*, Ex. 1, ECF 50-2.

Plaintiff—a nonprofit dedicated to government transparency—filed a FOIA request seeking records about the Circular 175 process for the Paris Climate Agreement.  *See, e.g.*, Compl. ¶¶ 12, 18.  State produced over 300 documents in response.  *See* Def.'s Mot. for Summ. J. (MSJ) at 3, ECF No. 47.  Three remain at issue:  (1) the action memo seeking written authorization to enter the Paris Climate Agreement, (2) a background document attached to it, and (3) a set of draft talking points entitled "Points on U.S. Domestic Approval Procedures for Becoming a Party to the Paris Agreement."  *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n), ECF No. 50-1; *see also* Decl. of Christopher Horner, Exs. 1–3, ECF No. 50-2.

State moves for summary judgment.  It argues that it properly redacted information in these three documents under Exemption 5's deliberative process and attorney-client privileges.  *See generally* MSJ.  And it contends that it produced all reasonably segregable material.  *See id.*  Plaintiff disagrees on both fronts.  *See generally* Pl.'s Opp'n.[2]  State's motion is ripe.  This Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## II.

Courts resolve the "vast majority" of FOIA cases at summary judgment.  *AARC v. CIA*,

---

[1]  Available at https://fam.state.gov (last accessed June 13, 2023).

[2]  Plaintiff does not challenge the adequacy of State's search.  *See* Pl.'s SMF ¶ 11.

317 F. Supp. 3d 394, 399 (D.D.C. 2018), *aff'd*, 781 Fed. App'x 11 (D.C. Cir. 2019) (per curiam). To prevail on a motion for summary judgment, a party must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

FOIA requires "disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions[.]"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  To obtain summary judgment, the agency bears the burden to show that any claimed exemptions apply.  *See ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Courts construe FOIA exemptions narrowly, *see Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011), and consider their applicability de novo, *see King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

To meet its burden, an agency may rely on declarations describing the applicability of a FOIA exemption to information that the agency has withheld.  *See Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018).  Such declarations receive "a presumption of good faith."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based solely on the agency's declarations if neither record evidence nor evidence of the agency's bad faith contradicts them.  *See Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017).

## III.

The only remaining disputes are whether State properly redacted material under Exemption 5 and met its segregability burden.  Exemption 5 protects records from disclosure "that would not be available by law to a party other than . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  In other words, it shields records "normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  State invokes the

deliberative process privilege for all of its Exemption 5 withholdings and the attorney-client privilege for a subset.  *See* Decl. of Susan C. Weetman (Weetman Decl.) ¶¶ 27–46, ECF No. 47-1; Ex. 1, ECF No. 47-2 (Vaughn Index); Second Decl. of Susan C. Weetman (2d Weetman Decl.) ¶¶ 5–6, ECF No. 51-3; Ex. 5, ECF No. 51-2 (Suppl. Vaughn Index).[3]  The Court takes each privilege in turn.

## A.

The deliberative process privilege "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it."  *Sierra Club*, 141 S. Ct. at 785.  It "is rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  *Id.* (cleaned up).  The privilege thus ensures that subordinates "will feel free to provide the decision-maker with their uninhibited opinions and recommendations" without fear of public ridicule. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  More, it "guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action" that the agency ultimately rejected.  *Id.*

To qualify for the deliberative process privilege, a document must be both pre-decisional and deliberative.  A document is pre-decisional if the agency generated it before its final decision on a matter.  *See Sierra Club*, 141 S. Ct. at 786.  A document is deliberative if the agency prepared it to "help the agency formulate its position."  *Id.*  Along with these two requirements, State must clear another hurdle.  To withhold exempt records, it must provide a focused, context-specific explanation about why disclosure would cause foreseeable harm to an interest protected

---

[3]  State filed a supplemental *Vaughn* index further detailing which parts of each document are covered by the attorney-client privilege.  *See* 2d Weetman Decl. ¶ 5; Ex. 5 (Suppl. Vaughn Index).

by FOIA.  *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021).  Though agencies could previously articulate a mere link between the withheld information and some foreseeable harm, this is no longer enough.  *See Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 109 (D.D.C. 2021) (describing this shift).

State must now provide a "focused and concrete demonstration of why disclosure of the particular type of material" will cause foreseeable harm "in the specific context of the agency action at issue."  *See Reps. Comm. v. FBI*, 3 F.4th at 370.  In other words, the agency cannot merely state that disclosure "could . . . adversely impair internal deliberations" or chill inter-agency speech; it must argue that disclosure *would* have that effect in context.  *Id.* at 369–70; *see also Machado Amadis v. DOS*, 971 F.3d 364, 371 (D.C. Cir. 2020) (upholding an assertion of the deliberative process privilege where an agency "specifically focused on the information at issue" in the responsive records and "concluded that disclosure of that information 'would' chill future internal discussions").  But even without enough explanation from the agency, the "context and purpose" of withheld information can support a finding of foreseeable harm.  *Reps. Comm. v. FBI*, 3 F.4th at 372.

### 1.

State has established that the redacted content in the three documents is both pre-decisional and deliberative.

First consider the action memo and its attachment.  Subordinate State Department employees sent the memo to the Secretary requesting his sign-off to accept the Paris Climate Agreement.  *See* MSJ at 10; Weetman Decl. ¶ 31.  State released "purely factual" portions, and information that "encompass[es] the final decision reached."  MSJ at 10; Weetman Decl. ¶ 33.

But it withheld parts in each document that subordinates drafted "for the Secretary to consider in making his decision" to sign the memo.  MSJ at 10; Weetman Decl. ¶ 34.  These withheld portions distill the thoughts of State employees about the merits or drawbacks of the suggested action.  *See* MSJ at 10; Weetman Decl. ¶ 34.  And they involve subordinates' "selection and analysis of facts" for the decision-maker.  Vaughn Index at 4.  One handwritten part specifically says it awaits a "final decision."  *Id.* at 3.  And another describes "with specificity, a potential course of action . . . that was ultimately decided against."  *Id.*

State has shown that the information in these two documents predated the Secretary's decision to sign the memo and that it informed his decision.  *See Sierra Club*, 141 S. Ct. at 786.  That the documents flowed from subordinates to the Secretary who makes the final call bolsters the conclusion that they are pre-decisional and deliberative.  *Accord Greenspan v. Bd. of Govs. of Fed. Reserve Sys.*, No. 21-cv-1968, 2022 WL 17356879, at *8 (D.D.C. Dec. 1, 2022); *Abtew v. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015).

Next consider the draft talking points.  An attorney at State without final decision-making authority prepared these for the National Security Council.  *See* MSJ at 11; Weetman Decl. ¶¶ 37, 34, 39.  At this point, the United States had not yet entered the Paris Climate Agreement.  *See* Weetman Decl. ¶ 39.  The talking points provide "initial guidance" about describing to a foreign counterpart the "domestic legal process for the United States to enter into an international agreement."  MSJ at 11; Weetman Decl. ¶ 37.  And they highlight the "potential framing of key issues," plus "rejoinders to hypothetical arguments that other interlocutors may make."  MSJ at 11; Weetman Decl. ¶ 38.  This document is pre-decisional because it predates the meeting for which it was prepared.  *See, e.g.*, *Advancement Project v. DHS*, 549 F. Supp. 3d 128, 138 (D.D.C. 2021).  And it is deliberative because it helped the National Security Council members

6

prepare for any final statements they may have made at the meeting.  *See, e.g.*, *Greenspan*, 2022 WL 17356879, at *13 (finding documents prepared to help decision-makers prepare for meetings pre-decisional and deliberative).

Plaintiff asserts—without support—that the talking points are "primarily factual in nature" or merely "messaging about existing policy" and thus should be released.  Pl.'s Opp'n at 12, 25–26.  But State's evidence belies that conclusion.  *See, e.g.*, Vaughn Index at 5 (points are "legal advice regarding the background and possible domestic legal processes" for entering the agreement); Weetman Decl. ¶ 38 (talking points "included suggestions on how to frame certain issues").  More, "factual material culled and presented to decision-makers through exercises of discretion" may be protected by the deliberative process privilege.  *Greenspan*, 2022 WL 17356879, at *11; *see also* Reply in Support of Def.'s MSJ (Reply) at 10, ECF No. 51 (collecting authorities).  State has adequately justified its withholdings of the talking points.[4]

**2.**

Next up is foreseeable harm.  State explains that disclosure of advice that subordinates provided to the Secretary would chill internal deliberations about future agreements if subordinates knew that the public, including foreign adversaries, could access that information.  *See* Weetman Decl. ¶ 35.  Such a chilling effect would degrade the quality of advice the Secretary receives when considering whether to enter future agreements.  *See id.*  More, disclosure of advice in the memo and its attachment could cause public confusion because portions reflect a course ultimately not adopted.  *See* Vaughn Index at 3; Weetman Decl. ¶ 36.  As State explains, the "danger of public confusion is particularly high" in this context because

---

[4]  And as explained in Part III.C, State is entitled to a presumption that it complied with its independent obligation to release all reasonably segregable materials.  *Accord* Reply at 12.

the redactions "could be improperly interpreted as positions of the U.S. Government" by domestic or foreign observers. Weetman Decl. ¶ 36.

Similarly, State explains that redactions in the draft talking points "do not reflect final Department policy." *Id.* ¶ 39. So their disclosure would "chill the flow of internal recommendations, candid assessments, and other necessary exchanges," hampering information flow. *Id.* ¶ 40. State notes that the harm would be "especially pronounced here given the highly sensitive nature of" what legal form the Paris Agreement should take. Vaughn Index at 6. More, release of a subordinate lawyer's opinions and ideas "would cause public confusion" about whether information they contain was a final decision. *Id.* As State explains, the final decision-makers in the National Security Council who received the draft talking points could have used or jettisoned them. *See* Weetman Decl. ¶ 39. Disclosing the contents of the talking points could thus confuse the public about what was actually said in a private meeting with foreign counterparts. *See id.*; *see also* Vaughn Index at 6.

State meets its foreseeable harm burden for all three redacted documents. It explains why release of each would impair internal deliberations surrounding future action memos or talking points. *Accord Reps. Comm. v. FBI*, 3 F.4th at 369–70. More, the D.C. Circuit has "long recognized that the risk of public confusion has a special force with respect to disclosures of agency positions or reasoning concerning proposed *policies*." *Reps. Comm. v. CBP*, 567 F. Supp. 3d at 122 (cleaned up). So too here. All of the redacted documents discuss subordinates' thoughts and analysis on proposed policies for decision-makers to review. *See, e.g.*, Vaughn Index at 2–6. Releasing such inchoate material could certainly mislead and foreseeably harm the agency's processes. *Accord Greenspan*, 2022 WL 17356879, at *17.

Plaintiff raises several counterarguments, but none persuade. *First*, Plaintiff protests that

because the Secretary signed the memo, it must be released in full.  *See* Pl.'s Opp'n at 4–5, 23–24.  This is so because a document that is pre-decisional when prepared "can lose that status if it is adopted, formally or informally, as the agency position[.]"  *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982).

But as State explains, the Secretary's signature reflects only approval of the memo's request to join the agreement—an official thumbs up.  *See* MSJ at 10.  Consider the redacted memo itself.  *See* Ex. 1, ECF No. 50-2.  It begins with two top-line recommendations: that the Secretary sign (1) the 2016 Paris Climate Agreement and (2) the "Instrument of Acceptance." Lines asking the Secretary to either "approve" or "disapprove" these recommendations using his signature fall just below.  *Id.*  The Secretary initialed both "approve" lines.  *See id.*  All of that information has been released.

But State's redactions are different because they encompass advice from subordinates teeing up the ultimate decision.  *See, e.g.*, Weetman Decl. ¶ 34.  While the Secretary agrees with the conclusion of the memo, his signature does not necessarily endorse his subordinates' preliminary advice—some of which he actually rejected.  *See* Vaughn Index at 3; *cf. Spears v. DOJ*, 139 F. Supp. 3d 79, 89 (D.D.C. 2015) (upholding withholding of action memo from subordinates to Assistant Attorney General seeking sign-off on wiretaps under the deliberative process privilege).  So the Secretary did not "adopt[], formally or informally," the redacted recommendations of his staff.  *Arthur Andersen & Co.*, 679 F.2d at 258.

*Second*, Plaintiff argues that the memo's contents must be released under the related "working law" doctrine.  *See* Pl.'s Opp'n at 23–24.  But the memo does not meet the high bar of "working law," defined as a "conclusive or authoritative statement of [agency] policy, usually a higher authority instructing a subordinate on how the agency's general policy applies to a

particular case, or a document that determined policy or applied established policy." *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 9 (D.C. Cir. 2014). Plaintiff has it backwards. The memo is information supplied by a subordinate to the Secretary seeking his final approval. *See, e.g.*, Weetman Decl. ¶ 34.

*Tax Analysts v. IRS*, which Plaintiff cites, *see* Pl.'s Opp'n at 24, is not to the contrary. There, the Circuit held that IRS advice memoranda were working law and must be released. *See* 117 F.3d 607, 617 (D.C. Cir. 1997). But the agency's chief counsel issued those memos in response to subordinates' questions to promote nationwide uniformity on tax law. *See id.* And subordinates routinely used and relied on them. *See id.* Those memos differ from State's action memo here, which subordinates sent to the Secretary for final sign-off and is not a formal statement of agency policy. *See, e.g.*, Weetman Decl. ¶¶ 33, 35–36; Vaughn Index at 2.

*Third*, Plaintiff calls State's foreseeable harm explanations "boilerplate" and "cookie-cutter." *See* Pl.'s Opp'n at 7, 9. For the reasons already explained, the Court disagrees. State follows the Circuit's instruction in *Reporters Committee for Freedom of the Press v. FBI* to provide a focused, context-specific discussion of potential harms. *See* 3 F.4th at 369–72.

*Fourth*, Plaintiff argues that disclosing the action memo will "aid" State because its employees will be "encouraged" to know the Secretary adopted their suggestions. Pl.'s Opp'n at 5, 7–8. In other words, Plaintiff believes that the "increased pride and improved morale from disclosure" would counter any chill on internal discussion. *Id.* at 8. *Accord Sears*, 421 U.S. at 161. But the Court is hard-pressed to understand how hypothetical projections about employee morale defeat State's assertions of foreseeable harm. More, as State explains, at least one of the redactions in the action memo was not accepted by the Secretary. *See* Vaughn at 3. Thus,

Plaintiff's objection is factually flawed and entirely conjectural.

*Fifth*, Plaintiff claims that different agencies have released *other* action memos publicly, so releasing this one would not cause harm.  *See* Pl.'s Opp'n at 6 (discussing the Energy Department's release of a State legal memorandum about an international agreement with the Czech Republic).  Maybe so, but that has little bearing on whether State fails to show foreseeable harm for Paris Agreement memo.  It does not follow that because other agencies have voluntarily released similar memos, State should be compelled to release the action memo here.  All Plaintiff offers is speculation that State employees "might well have" disseminated the memo already.  Pl.'s Opp'n at 15.  That is not enough.

In sum, State's deliberative process privilege withholdings are proper.

**B.**

Recall that State invoked attorney-client privilege for a subset of its redactions.  The attorney-client privilege encourages clients "to be as open and honest as possible with attorneys."  *Coastal States*, 617 F.2d at 862.  In the governmental context, "the client may be the agency and the attorney may be an agency lawyer."  *Tax Analysts*, 117 F.3d at 618.  And the privilege "extends to all situations in which an attorney's counsel is sought on a legal matter."  *Coastal States*, 617 F.2d at 862.  Confidentiality is a "fundamental prerequisite" of this privilege, and must exist both when information is communicated and after.  *Id.* at 863.

**1.**

State properly justified its attorney-client privilege withholdings.  It withheld parts of the action memo and background document under this privilege, plus all of the draft talking points.  *See* Suppl. Vaughn Index.

First, the action memo and attachment.  State noted they contain "legal analysis and

advice" from State's attorneys to inter-agency clients about the Paris Agreement and acceptance of it.  Vaughn Index at 3.  The background document contains more of the same.  *See id.* at 5. And they "include facts divulged to one or more attorneys for the purpose of obtaining legal advice."  Weetman Decl. ¶ 45.  Releasing this information would reveal the legal questions the agency clients had, plus information provided to attorneys so they could provide answers.  *See* Vaughn Index at 3, 5.  State also attests that all redacted legal advice "was kept confidential within the executive branch."  *Id.*  Those assertions, plus the presumption of good faith the Court affords agency declarations, more than establishes the privilege.  *Accord Reps. Comm. v. CBP*, 567 F. Supp. 3d at 117–18.

Second, the talking points.  State explains that the National Security Council asked an attorney-advisor for State to prepare them.  *See* 2d Weetman Decl. ¶ 12.  That attorney then sent talking points providing legal advice about the background and domestic legal process through which the United States may join the Paris Agreement.  *See* Vaughn Index at 6.  State again reassures that all redacted legal advice "was kept confidential within the executive branch."  *Id.* at 6.  These assertions also establish the privilege; the draft talking points involve legal matters for which one agency "has sought professional advice" from State's attorneys.  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).

Plaintiff counters that State fails to establish confidentiality for a few reasons.  *See* Pl.'s Opp'n at 14–22.  *First*, Plaintiff claims that another document attached to the action memo (a legal memorandum) was publicly released in unredacted form.  *See id.* at 15.  But as State points out, that another document allegedly accompanying the action memo was leaked does not eviscerate its assertions that the action memo and background document are privileged.  *See* Reply at 13.  These are distinct documents and State justified its privilege assertions for the ones

at issue.

If Plaintiff intends to extend its argument about the leaked document to State's deliberative process privilege withholdings, it fails for the same reasons. More, Judge Mehta recently held that this legal memo merits deliberative process protection even though a putative version of it leaked. *See Competitive Enter. Inst. v. DOS*, 486 F. Supp. 3d 171, 184 (D.D.C. 2020). The Court agrees with his reasoning. A leaked document that the agency steadfastly refuses to authenticate does not explode privilege because it does not qualify as an official agency acknowledgment. *See id.* at 184–85. And in any event, Plaintiff does not challenge State's withholding of the legal memo. *See generally* Pl.'s Opp'n. So even if the leak somehow waived that memo's privilege, neither the action memo nor the background attachment have suffered the same fate.

*Second*, Plaintiff protests that State's Vaughn index does not list the name of each document's author or its recipients. *See* Pl.'s Opp'n at 16. And Plaintiff cites out-of-circuit district court cases that required these details and more. *See id.* at 16–18, 20–22 (arguing that privilege logs and attorney bar numbers are also necessary). Because State did not include these descriptions, Plaintiff claims it waived privilege. *See id.* Not so.

Plaintiff overlooks that State's Vaughn index includes the attorney's name who sent the talking points to the National Security Council. *See* Vaughn at 6. And it clarifies that the Council requested those talking points from the attorney. *See* Suppl. Vaughn Index ¶ 12. More, the action memo State produced lists the drafters of the document (all subordinates) and those cleared to receive it. *See* Ex. 1, ECF 50-2; Weetman Decl. ¶ 34. State repeats the agencies for whom the recipients work in its Vaughn index. *See* Vaughn Index at 1–2. And its declarant underscores that all documents remain confidential between State's attorneys and other agency

clients. *See, e.g.*, Weetman Decl. ¶¶ 43, 46. That is enough. *See, e.g.*, *Reps. Comm. v. CBP*, 567 F. Supp. 3d at 117–18 (upholding attorney-client privilege withholdings when agency noted which offices they originated from and attested that they were responses to agency requests for legal advice).[5]

In sum, State appropriately justified it attorney-client privilege withholdings.

## 2.

State also meets its foreseeable harm burden. To date, the D.C. Circuit has applied this requirement only to the deliberative process privilege, but the text is not so limited. *See Reps. Comm. v. FBI*, 3 F.4th at 369–70; 5 U.S.C. § 552(a)(8)(A)(i)(I). Still, as this Court has explained, an agency's foreseeable harm burden "may be more easily met when invoking other privileges . . . for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated." *Reps. Comm. v. CBP*, 567 F. Supp. 3d at 120.

The attorney-client privilege falls within this category. *See id*. Releasing attorney-client communications "would undoubtably undermine our legal culture" because agencies "would lose an important tool in their decisionmaking process—employees' ability to confidentially consult agency lawyers." *Id*. The law therefore "already acknowledges and guards against the risk of harm that would come from disclosing attorney-client communications." *Id*.

State has articulated a persuasive description of that risk. The record shows that disclosure of the redactions would impair the relationship of trust between an agency and its attorneys. *See, e.g.*, Weetman Decl. ¶ 46; Vaughn Index at 3, 5–6. And it would "undermine the

---

[5] Importantly, there is no evidence that State shared these documents with non-Governmental personnel. *Cf. Georgia v. DOJ*, No. 21-cv-3138, 2023 WL 2116375, at *4–6 (D.D.C. Feb. 20, 2023) (finding DOJ failed to meet FOIA's threshold intra-agency requirement when it shared documents with private parties who did not act as consultants).

ability and willingness of executive branch officials to seek legal advice before making decisions about issues with significant legal ramifications." *Id.* at 3; *see also id.* at 5–6. More, as State's declarant explains, receiving legal advice as part of an action memo is "essential to appropriately entering into an international agreement." Weetman Decl. ¶ 46. Thus, State satisfies its foreseeable harm burden for the attorney-client privilege redactions. *Accord Machado Amadis v. DOJ*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019) (finding agency's concern about potential chilling effect of disclosure of attorney work product sufficient to show foreseeable harm), *aff'd sub nom. Machado Amadis v. DOS*, 971 F.3d 364 (D.C. Cir. 2020).

### C.

Finally, State must "demonstrate that all reasonably segregable material has been released." *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002). To meet this burden, it can rely on both its declarations and *Vaughn* Index. *See id.* State is also "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To overcome the presumption, Plaintiff must present a "quantum of evidence." *Id.*

State declares that it conducted "line-by-line review" of each document before determining that no more information could be segregated and released. *See* Weetman Decl. ¶ 5; Vaughn Index; Suppl. Vaughn Index. These sworn statements are presumed accurate. *Accord Reps. Comm. v. CBP*, 567 F. Supp. 3d at 131.

Plaintiff briefly argues that State improperly withheld factual information. *See* Pl.'s Opp'n at 10–11. It claims that State's segregability representations are contradictory and conclusory. *See id.* The Court disagrees. And in any event, Plaintiff provides no evidence, much less a "quantum," that overcomes the presumption that the agency released all reasonably

segregable information.  *See Sussman*, 494 F.3d at 1117.  The Court thus finds that State has met its burden.[6]

**IV.**

For these reasons, the Court will grant State's Motion for Summary Judgment.  A separate order will issue today.


Dated:  June 27, 2023                                    _____
                                                         TREVOR N. McFADDEN, U.S.D.J.

---

[6] Plaintiff suggests that the Court should conduct *in camera* review of documents to see whether State reasonably segregated factual information.  *See* Pl.'s Opp'n at 13.  Such review is a "discretionary tool" in this circuit, *see, e.g.*, *Juarez v. DOJ*, 518 F.3d 54, 59–60 (D.C. Cir. 2008), and the Court finds it unnecessary to resolve State's motion.